**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Diane TURNER (90–1546), Edwin
Leon Turner (90–1547),
Defendants–Appellants.**

**Nos. 90–1546, 90–1547.**

United States Court of Appeals,
Sixth Circuit.

Argued April 1, 1991.

Decided May 29, 1991.

Mark Andrew Miller, Asst. U.S. Atty., Jennifer J. Peregord (argued), Office of the U.S. Atty., Eric M. Straus, Asst. U.S. Atty., U.S. Dept. of Justice, Detroit Strike Force, Detroit, Mich., for plaintiff-appellee.

Ada Snyder Kerwin (argued), Joan E. Morgan (argued), Detroit, Mich., for defendants-appellants.

Before MARTIN, GUY, and NELSON, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendants Diane and Edwin Turner appeal their jury convictions for conspiracy to distribute cocaine, importation of cocaine, aiding and abetting the importation of cocaine, and conspiracy to import cocaine in violation of 21 U.S.C. §§ 846, 952(a), 18 U.S.C. § 2, and 21 U.S.C. § 963, respectively. On appeal, defendants argue that the district court erred in (1) not conducting an evidentiary hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); (2) failing to dismiss the indictment since the government violated its agreement not to prosecute them; (3) denying defendants' motion for change in venue; and (4) not granting a mistrial after a dictionary was found in the jury room. For the following reasons, we affirm the conviction of Diane Turner and remand the conviction of Edwin Turner to the district court.

Diane and Edwin Turner operated the Hawk's Nest Resort on Cat Island in the Bahamas. The resort contained both an airstrip and a marina and was used as a drop-off location for cocaine being trans-

ported from Colombia to the United States. Typically, cocaine would be flown in from Colombia and loaded onto small boats bound for private residences in Florida. The Turners sometimes supervised the landing and unloading of these planes. The Turners required payment of $250,000 to $300,000 for each plane which landed on their airstrip.

Defendants Diane and Edwin Turner raise four issues on appeal. First, defendants argue that the district court erred in not conducting a *Kastigar* hearing in order to determine whether the government's evidence concerning the Turners' illegal activity was obtained independently of their prior "immunized" testimony. Apparently, Edwin Turner testified before a grand jury sitting in the Southern District of Florida on March 23, 1988, and had also cooperated with Florida State Law Enforcement Officials. An affidavit submitted by Roger Colton, the Turners' attorney in Florida, represented that Edwin Turner was promised "criminal immunity within the Southern District of Florida. It [the immunity] could not go outside or bind any other district other than the Southern District of Florida." The affidavit went on to note that "[i]t would be a derivative use immunity in that nothing that Mr. Turner said would be disseminated to any other agencies that could ever be used against him." With respect to the immunity granted by the State of Florida, it was characterized as "use immunity" by William G. Wolfe, Special Agent for the Florida Department of Law Enforcement. These two affidavits were the only documents introduced concerning the "immunity" granted to the Turners. The affidavits do not indicate that Diane Turner was ever granted any type of immunity. However, at trial Attorney Colton testified that Diane Turner was granted the same type of immunity as Edwin Turner by federal officials in the Southern District of Florida.

The government argues that the dictates of *Kastigar* are not implicated in this case because the Turners were never granted the requisite *statutory* immunity. The "immunity" which the Turners were granted in the Southern District of Florida by the federal prosecutor is sometimes referred to as "pocket immunity." *See United States v. Friedrick*, 842 F.2d 382, 393, n. 14 (D.C.Cir.1988). This informal immunity arises by way of assurances by prosecutors, either orally or by letter, to a potential grand jury witness that he will be immune from any prosecution based upon that testimony. Such decisions are made informally, outside the supervision of a court. The legality of granting informal immunity has been upheld in a number of circuits. *See id.; United States v. Anderson*, 778 F.2d 602 (10th Cir.1985); *United States v. Winter*, 663 F.2d 1120 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983); *United States v. Librach*, 536 F.2d 1228 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

Essentially, the "immunity" the Turners received in the Southern District of Florida was nothing more than a promise on the part of the federal prosecutor that they would not be charged in that district and that their testimony would not be disseminated to other government agencies. Such promises of "immunity" are contractual in nature and do not bind other parties not privy to the original agreement. *See United States v. Peister*, 631 F.2d 658, 662 (10th Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). This is in contrast to a formal statutory grant of immunity. The federal immunity statute prohibits the compelled testimony of a witness from being used against him "in *any* criminal case...." Immunity of Witnesses Act, § 201(a), 18 U.S.C. §§ 6001–6005. In order for a federal prosecutor to grant this type of immunity, he must receive approval from both the United States Attorney in the relevant judicial district, and from a high-ranking official in the Justice Department; the immunity grant must also be approved by a federal district judge. *See* 18 U.S.C. § 6003. This immunity assures a witness that his immunized testimony will be inadmissible in any future criminal proceeding, as will be any evidence obtained by prosecutors directly or indirectly as a

result of the immunized testimony. 18 U.S.C. § 6002.

In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that when a witness who has given incriminating testimony under a grant of immunity pursuant to 18 U.S.C. § 6002 is subsequently prosecuted for a matter related to the compelled testimony, the government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id.* at 461, 92 S.Ct. at 1665. *See also Murphy v. Waterfront Comm'n of New York*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

The district court was not required to hold a *Kastigar* hearing with respect to the "immunity" granted to the Turners by the federal prosecutor. The federal prosecutor does not have any authority to immunize testimony absent compliance with the requirements of the federal immunity statute. He does, however, possess sole discretion in his particular district with respect to the decision to prosecute. *See United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). In this case, the Turners did not receive a federal statutory grant of immunity; instead, they were promised that in exchange for their helpful testimony in a federal investigation, they would not be prosecuted in the Southern District of Florida and further, that their testimony would not be disseminated to other government agencies. Presumably, the Turners would have normal contractual remedies available to them if the federal prosecutor breached his promise. *See United States v. Black*, 776 F.2d 1321 (6th Cir.1985) (immunity agreement is contractual in nature); *see also Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Turners have not alleged that they were prosecuted in the Southern District of Florida nor do they contend that their testimony was disseminated to other government agencies.

■ The immunity Edwin Turner received from the State of Florida presents a somewhat different situation. The Florida immunity statute provides:

> No person who has been duly served with a subpoena or subpoena duces tecum shall be excused from attending and testifying or producing any book, paper, or other document before any court having felony trial jurisdiction, grand jury, or state attorney upon investigation, proceeding, or trial for violation of any of the criminal statutes of this state upon a ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to convict him of a crime or to subject him to a penalty or forfeiture, but no testimony so given or evidence so produced shall be received against him upon any criminal investigation or proceeding. Such testimony or evidence, however, may be received against him upon any criminal investigation or proceeding for perjury committed while giving such testimony or producing such evidence or for any perjury subsequently committed.

Fla.Stat. § 914.04 (1989). This statute has been interpreted as being self-executing; thus, the statute automatically grants use immunity to one who testifies under the circumstances it delineates. *Jenny v. Florida*, 447 So.2d 1351 (Fla.1984) (witness does not have to assert privilege against self-incrimination to be granted immunity under statute); *Meek v. Florida*, 566 So.2d 1318 (Fla.Dist.Ct.App.1990), *review denied*, 581 So.2d 167 (Fla.1991). The record before us is not clear as to whether Edwin Turner's testimony was, in fact, given under those conditions necessary to implicate the Florida statute. The affidavit of Special Agent William Wolfe indicates that Edwin Turner testified in a number of state criminal trials and also gave sworn deposition testimony. The record does not indicate, however, whether Edwin Turner's testimony in those circumstances was compelled by subpoena which is necessary to trigger the Florida statute. If Turner did testify pursuant to a subpoena, his testimony would have been immunized by the Florida statute; if Turner was not compelled to testify, the Florida statute would not be applicable. Wolfe's affidavit indicates that Diane Turner also

provided information, but only through her husband. This, however, is insufficient under the Florida statute to be granted use immunity. Diane Turner never established, at least to this court's satisfaction, that she ever received use immunity for her testimony under the Florida statute. At trial, Roger Colton was asked by the court whether the state ever granted Diane Turner use immunity. He responded, "[s]o to answer that question, I would say no, because it wasn't felt that it was needed." Therefore, any discussion that follows only applies to Edwin Turner. We find that Diane Turner was not entitled to a *Kastigar* hearing.

■ In *Murphy v. Waterfront Comm'n of New York*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Supreme Court held that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law. *Id.* at 78–79, 84 S.Ct. at 1609. In order to implement this rule, the Court noted:

> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

*Id.* at 79, n. 18, 84 S.Ct. at 1609, n. 18. If Edwin Turner testified under a state grant of immunity, federal authorities were required to demonstrate that their evidence implicating him was obtained independent of his immunized testimony.

■ The government argues that it met its burden of establishing an independent source by submitting affidavits in which federal officials involved in the Turner investigation disclaimed any prior knowledge of Edwin Turners' immunized testimony. These affidavits, however, are insufficient to meet the dictates of *Kastigar;* the government must identify the independent source of the evidence used against Edwin

Turner. *See United States v. Overmyer*, 899 F.2d 457, 464 n. 12 (6th Cir.) (testimony from government agents involved in investigation that they had not reviewed immunized transcripts was insufficient to satisfy burden of *Kastigar)*, cert. denied, —— U.S. ——, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990).

■ Therefore, with respect to Edwin Turner, remand is necessary for the limited purpose of allowing the district court to ascertain whether Edwin Turner's testimony in the Florida state criminal proceedings was compelled by subpoena. If Turner demonstrates that his testimony was compelled, the district court must next determine whether the evidence used at trial against Edwin Turner was in fact derived from a legitimate source wholly independent of his immunized testimony. *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664. If the district court determines that the government makes the necessary affirmative showing, the conviction against Turner will stand. If the evidence is not shown to be derived from legitimate independent sources, then Edwin Turner must be granted a new trial where the tainted evidence will be inadmissible. If the government fails to meet its burden, but the district court determines that the use of the tainted evidence is harmless beyond a reasonable doubt, then the conviction must stand.

■ The Turners next argue that the indictment against them should have been dismissed because the government breached its agreement not to prosecute them. This argument deserves little attention, since the government only promised not to prosecute them in the Southern District of Florida. This promise was kept. The Turners' attorney in Florida testified at trial that "[i]t was very, very clear that the immunity, only applied to the Southern District of Florida, if the Assistant U.S. Attorney ... made that clear once, he must have made it clear at least half-a-dozen times." Furthermore, even if the Turners were promised that they would not ever be prosecuted by the government, it is unclear that a United States Attorney in one judicial district has the power to bind another United States Attorney in another judicial

district. *See United States v. Robison*, 924 F.2d 612 (6th Cir.1991) (noting the split in circuits which have addressed the issue).

The Turners next argue that the district court abused its discretion when it denied defendants' motion for change of venue. The grant or denial of a motion for change of venue rests within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *United States v. Williams*, 897 F.2d 1034 (10th Cir.1990). In this case, the Turners were charged with and convicted of conspiracy to distribute cocaine, conspiracy to import cocaine, and aiding and abetting the importation of cocaine. A defendant must be tried in the state or district where the crime was committed. *Travis v. United States*, 364 U.S. 631, 634, 81 S.Ct. 358, 360, 5 L.Ed.2d 340 (1961). Conspiracy and drug importation are "continuous crimes"; that is, they are not completed until the drugs reach their final destination, and venue is proper "in any district along the way." *United States v. Lowery*, 675 F.2d 593, 594 (4th Cir.1982); *see also United States v. Scaife*, 749 F.2d 338, 346 (6th Cir.1984) (venue is proper in conspiracy prosecutions in any district where an overt act in furtherance of the conspiracy takes place). There was substantial evidence introduced at trial which indicated that the southeastern Michigan was the final destination for large amounts of the cocaine smuggled into the United States by the drug conspiracy in which the Turners were involved. Thus, the Eastern District of Michigan was a proper venue for the charges against the Turners.

Finally, the Turners argue that the district court erred in not granting a mistrial after it was discovered that the jury utilized a dictionary after their request for one was denied by the judge. During their deliberations, the jury requested a dictionary from Judge Friedman, who was substituting for Judge Cohn. Judge Friedman denied their request. When Judge Cohn returned he informed counsel that a dictionary was found in the jury room the night before. There pieces of paper had been inserted at the pages beginning with M, O,

and S. Defense counsel opined that the jury had been looking up the definitions of "manager," "organizer," and "supervisor." Defense counsel all joined in a motion for a mistrial.

The district court refused to grant a mistrial and instead it summoned the jurors and instructed them that they had improperly consulted the dictionary and were to disregard any definition they had read and should interpret the relevant words in a "common-sense fashion." He further instructed them that if they had reached a verdict on any count through the use of a definition they looked up in the dictionary, they were to re-deliberate on that count using the common meaning of the words. The judge then asked the jury if there was anyone who could not continue to deliberate under these conditions. No one responded, so the judge sent the jury back to continue its deliberations.

This court was presented with a similar situation in *United States v. Griffith*, 756 F.2d 1244 (6th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985), where the jury had improperly obtained a dictionary from the district court's law clerk. The court held that although the jury's use of a dictionary is error, it is not prejudicial *per se*. *Id.* at 1251. The court went on to note that

> [w]hen a jury makes unauthorized use of a dictionary, the trial judge should determine whether the jury actually substituted the dictionary definition of a legal term for that given in the instructions. If any jurors substituted the dictionary definitions, the court should determine whether any use of the dictionary resulted in prejudice to the defendant.

*Id.* at 1252. The fact that the district court judge found slips of paper beginning at M, O, and S provides compelling evidence that the jury probably did use the dictionary to obtain definitions to legal terms. The judge did attempt to rectify the dictionary problem according to the teaching of *Griffith*. Although he did not follow the procedure outlined in *Griffith*, he did attempt to insure that no defendant was prejudiced by the jury's exposure to the dictionary. In-

stead of determining whether the jury had substituted a dictionary term for a legal term, the judge simply instructed the jury to *not* use the dictionary definition and sent them back to deliberate. He did ask, however, if any juror could not use the normal common-sense meaning of the words in an attempt to guard against potential prejudice. Because the trial judge took the necessary steps to insure against any potential prejudice resulting from the jury's use of the dictionary, his decision not to grant a mistrial was not an abuse of discretion.

Therefore, we affirm the conviction of Diane Turner and remand the conviction of Edwin Turner to the district court.