21 F.3d 428
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth R. BERRY, Defendant-Appellant.
 No. 93-5376.
 United States Court of Appeals, Sixth Circuit.
 March 24, 1994.
 
 Before: KENNEDY and GUY, Circuit Judges; and FEIKENS, Senior U.S. District Judge.*
 PER CURIAM.
 
 
 1
 On December 30, 1992, a jury in the Eastern District of Kentucky returned a verdict of guilty against Kenneth R. Berry for conspiring to possess with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846. Berry raises three issues on appeal. First, he alleges that the district court erred when it failed to dismiss the case for lack of venue. Second, Berry claims that the trial court incorrectly permitted the government to make allegedly prejudicial comments during its closing argument. Finally, Berry contends that the sentencing court impermissibly gave him a three-point sentencing enhancement under section 3B1.1(b) of the United States Sentencing Guidelines. We affirm the district court's decision in its entirety.
 
 
 2
 I. Whether the district court had proper venue to hear this case.
 
 
 3
 As noted above, Berry was charged with and convicted of being part of a conspiracy to possess with intent to distribute cocaine. The government alleged that Berry and his companions travelled from Lexington, Kentucky to Texas where they proceeded to purchase a large amount of cocaine from persons who, as it turned out, were undercover narcotics agents. Berry argues that the jury's finding of venue was improper because (1) the conspiracy was not formed in the Eastern District of Kentucky, and (2) no overt acts in furtherance of the conspiracy occurred in the Eastern District of Kentucky. We disagree.
 
 
 4
 Venue is an essential element of the government's case which must be established by a preponderance of the evidence. United States v. Beddow, 957 F.2d 1330, 1335 (6th Cir.1992); United States v. Scaife, 749 F.2d 338, 346 (6th Cir.1984) ("If the government does not establish venue and the defendant objects at trial, then an appellate court must reverse the conviction."). Venue may be proved either by direct or circumstantial evidence. See, e.g., United States v. Kiser, 948 F.2d 418, 425 (8th Cir.1991), cert. denied, 112 S.Ct. 1666 (1992). If determining venue turns on questions of fact, those questions are to be resolved by the jury. United States v. Redfearn, 906 F.2d 352, 354 (8th Cir.1990). The court of appeals will review a district court's denial of a motion for change of venue for abuse of discretion. United States v. Turner, 936 F.2d 221, 226 (6th Cir.1991).
 
 
 5
 Section 3237 of Title 18 sets out the requirements for establishing venue where the offense is begun in one district and completed in another:
 
 
 6
 Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
 
 
 7
 18 U.S.C. Sec. 3237(a) (1988). In conspiracy cases, "venue is proper in ... any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." Scaife, 749 F.2d at 346.
 
 
 8
 A. Whether the conspiracy was formed in the Eastern District of Kentucky
 
 
 9
 The gravamen of Berry's argument is that venue was improper because the future co-conspirators formed no agreement in the Eastern District of Kentucky to travel to Texas to buy the cocaine. He claims that he and his co-defendants, while in Kentucky, only agreed to go to Texas to consider buying cocaine if they were comfortable with the people they were to meet there. This is important for the question of venue because an "an agreement to negotiate an agreement to commit [a crime] is not an agreement to commit [that crime.]" United States v. Podolsky, 798 F.2d 177, 178 (7th Cir.1986). "[P]reparatory acts alone are insufficient to support venue...." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1190 (2nd Cir.), cert. denied, Lavery v. United States, 493 U.S. 933 (1989). We accordingly examine the record to determine whether the jury could conclude that co-conspirators agreed to purchase the cocaine in Texas some time before they left the Eastern District of Kentucky.
 
 
 10
 Co-defendant Floyd Watkins testified that he approached Berry in Kentucky in June of 1992 to sell him cocaine through Joel Williams, a contact living in Irving, Texas. Berry and Watkins had a general discussion about the price and quantity of the cocaine but Watkins, at that time, could not provide Berry with any further specific information. Watkins accordingly telephoned Williams to obtain further details. After this telephone conversation, Watkins was able to give Berry a definite price for the cocaine. Watkins nevertheless maintains that he and Berry had not yet agreed to purchase cocaine after this round of discussions. As Watkins testified, "after our initial meetings, Berry, he pretty much put it off."
 
 
 11
 The relevant events occurred between June and July of 1992. The next relevant meeting occurred several weeks later when Berry apparently approached Watkins and asked to be introduced to Watkins' friend in Texas. Berry argues that the purpose of the ensuing trip to Texas was only to introduce Berry to Williams. Berry claims that the following Watkins testimony supports his contention that the agreement to purchase cocaine was formed in Texas, after Berry had a chance to meet Williams and "check him out."
 
 
 12
 1. Q. Now, if you would, what kind of negotiation or what were you settling for during this time that you were getting together? Was there a specific amount?
 
 
 13
 A. During this time, it wasn't a specific amount, it was pretty much the introduction, going down and introducing Mr. Berry and Mr. Williams. (App. at 85).
 
 
 14
 2. Our intentions, when we headed out to Texas, were for me to introduce Mr. Berry to Mr. Williams ... [f]or the purpose of, first, just to get them introduced, and then, I guess, to discuss whatever business they were going to take care of as far as the purchase of drugs.
 
 
 15
 ....
 
 
 16
 For the purpose of, not to purchase it. At that point it wasn't the purchase. (App. at 87-88).
 
 
 17
 3. [T]hey didn't bring any cash with them.... [W]hat we were down here [in Texas] for initially was to introduce [Williams to Berry] and pretty much so they could work their deal out. (App. at 90).
 
 
 18
 4. Q. When you got out of the State of Kentucky, when you left out of the State of Kentucky, there was no agreement to do anything other than meet somebody; is that right?
 
 
 19
 A. Than to meet. (App. at 102).
 
 
 20
 5. Q. And your understanding at that point was nothing more than going out to meet somebody?
 
 
 21
 A. That was it. (App. at 103).
 
 
 22
 Berry maintains that given the above-quoted testimony, the jury should have concluded that there was no agreement to purchase cocaine while the parties were still in Lexington and that venue therefore was improper. We disagree.
 
 
 23
 The facts sufficiently establish that the co-conspirators reached their agreement to possess cocaine while still in Kentucky. "Proof of a formal agreement is unnecessary; a tacit or mutual understanding among the parties is sufficient to show a conspiracy." United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991); see also United States v. Hughes, 891 F.2d 597, 601 (6th Cir.1989) (noting that the "existence of a conspiracy may be inferred from the acts done with a common purpose").
 
 
 24
 The objective evidence alone--without the self-serving testimony of Watkins--supports the jury's finding that the agreement was formed in Kentucky: co-conspirator Watkins testified that (1) that he and Berry discussed the matter in Kentucky, (2) Watkins took a trip from Kentucky to Texas and met Williams, (3) Berry then contacted Watkins in Lexington, and (4) the two drove to Texas and eventually tried to buy cocaine. While Berry and Watkins had not brought money with them from Kentucky, they clearly had gone to great lengths to actually buy the cocaine and bring it back from Texas. For example, they drove all the way from Lexington to the Dallas area, they were armed, and they had a good idea about the price of the cocaine. These fairly extensive steps indicate that their implicit understanding was to go to Texas to buy the cocaine, not just to negotiate. The jury certainly was free to accept this inculpating part of Watkins' testimony and reject testimony tending to show that there was "no meeting of the minds" upon leaving Kentucky.
 
 
 25
 B. Whether overt acts in furtherance of the conspiracy took place in the Eastern District of Kentucky
 
 
 26
 The jury also could have concluded that overt acts in furtherance of the conspiracy took place in Kentucky. Once Berry and Watkins reached Texas and met with Williams, Berry telephoned co-defendant Gary Brown and told him to fly to Texas with the money needed to complete the drug transaction. Berry does not dispute that he telephoned Brown or that Brown flew to Texas with money. He only contends that neither of the two witnesses who testified about these events--Floyd Watkins and Joel Williams--had any direct knowledge about whether Brown's flight originated in Lexington. Although there may have been no direct evidence about the origin of Brown's flight, circumstantial evidence adequately supports the conclusion that the flight originated in Kentucky. Berry and Watkins lived in Kentucky; it certainly was likely that Berry would have the money brought from there. Further, Watkins testified that Berry made the arrangements to have the money flown in and that he understood that "[i]t was coming from Lexington." And, as Williams testified, "[Berry] picked up the phone and called Mace [Brown]. I don't know if he paged him or what, but Mace called back to the hotel room to Jed's [Berry's] room, and he told Mace to get that bag and come take the first flight out of Kentucky." Based on this testimony, the jury could reasonably conclude that Berry telephoned Brown in Kentucky and that Brown traveled from Kentucky to Texas with the money.
 
 
 27
 II. Defendant's objections to statements made during the government's closing argument
 
 
 28
 Berry also objects to certain comments Assistant U.S. Attorney Mark A. Wohlander made during closing arguments, claiming that the comments violated his right to due process and his Sixth Amendment right to an impartial jury. Wohlander stated:
 
 
 29
 Ladies and gentleman, recently there were some events in the Middle East. We all recall the exact conflict, Desert Storm. I just recently finished reading Norman Schwartzkopf's book. But I couldn't sit here and say to myself exactly what the United States did to the Iraqis when they tried to put up a smoke screen and draw them to the shore thinking that the attack was going to come from the ocean, the attack was going to come from the south. So they all moved over there, and they brought all their troops and all their tanks, and they waited for the United States to come from the shore. That was a smoke screen. That's exactly what counsel wants you to think, ladies and gentlemen. It's a smoke screen. If you don't have the facts and you don't have the law, put up a smoke screen. Ladies and gentlemen, don't be fooled like the Iraqis. Go up there and use your common sense and don't be--
 
 
 30
 Ms. Sullivan [Attorney for Defendant Gary Brown]: I object.
 
 
 31
 ....
 
 
 32
 The Court: All right. Overruled.
 
 
 33
 Mr. Wohlander: Don't be out flanked like the Iraqis were, ladies and gentlemen....
 
 
 34
 (App. at 157) (emphasis added).
 
 
 35
 Appeals to patriotism, especially in the face of a commonly perceived national enemy, can, under certain circumstances, so inflame the passions and prejudices of a jury that a defendant could be denied a fair trial. Viereck v. United States, 318 U.S. 236, 247-48 (1943) (noting that the prosecutor's suggestion--that the failure to convict the defendant during World War II--was tantamount to disloyalty was "highly prejudicial"); United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir.1991) (inflaming the jury with rhetoric about the "War on Drugs" violated a drug-charge defendant's right to a fair trial). Berry argues that at the time of trial Americans still widely perceived Iraq as an enemy and that the government's comments could only be perceived of as an inappropriate appeal to patriotism designed to inflame the passions of the jury. He claims that Viereck and Solivan are on point and mandate a reversal.
 
 
 36
 We have no doubt that Iraq was widely perceived by Americans as an enemy at the time of Berry's trial. Nevertheless, Berry overstates the similarities of his case to Viereck and Solivan. The prosecutor's error in both Viereck and Solivan was to equate the defendant with a commonly perceived enemy. The prosecution of each case was part of a greater effort to combat a commonly perceived enemy: the Axis powers in Viereck and drugs in Solivan. Here, Berry alleges that the commonly perceived enemy referred to in the government's closing argument was Iraq. But Berry was being prosecuted for a drug crime, not--in any way--with assisting the enemy. Furthermore, the prosecutor's comments in this case simply do not equate Berry and his co-defendants with the Iraqis. Instead, the statements equate Berry and his co-defendants with the American troops and their successful attempts to trick the Iraqis with a "smoke screen." The statements actually compare the lot of the Iraqi soldiers during the war with the lot of the jury during Berry's trial.
 
 
 37
 In sum, the government's metaphor did not equate the particular social evil with the crime charged. Instead, the particular "evil" was equated to the defendants' trial tactic of allegedly throwing up a legal "smoke screen." The message of the prosecutor's statements is to warn the jury not to be foolish; that is, members of the jury should convict to avoid the lot of the Iraqis. Like many metaphors used at trial, this statement was in part designed to draw on the emotions of the trier of fact. But here, unlike Solivan, the prosecutor did not "direct the jurors' desires to end a social problem toward convicting a particular defendant." Solivan, 937 F.2d at 1153.
 
 
 38
 III. Whether the trial court properly enhanced Berry's sentence three points pursuant to U.S.S.G. Sec. 3B1.1(b)
 
 
 39
 The district court meted out a three-point sentencing enhancement for Berry's role as a manager or supervisor of the criminal activity. Berry objects to this enhancement, arguing that this determination is unsupported by the record.
 
 Section 3B1.1(b) states:
 
 40
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 41
 ....
 
 
 42
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 43
 ....
 
 
 44
 USSG Sec. 3B1.1(b). A section 3B1.1 enhancement is warranted only if Berry exercised control over others; the mere fact that Berry exercised control over or "managed" the money and the guns, for example, would not make him a manager or supervisor under section 3B1.1(b). See, e.g., United States v. Hoac, 990 F.2d 1099, 1110 (9th Cir.1993) (government must establish that the defendant exercised "control over others"), cert. denied, 1994 U.S. LEXIS 1562 (1994); United States v. Fuentes, 954 F.2d 151, 153 (3rd Cir.) (emphasis added) (holding that merely managing a crack house--without a showing that the defendant managed people--does not warrant a section 3B1.1 enhancement), cert. denied, 112 S.Ct. 2950 (1992); United States v. Brown, 944 F.2d 1377, 1381-82 (7th Cir.1991) (remarking that the government must present some evidence of the defendant's supervisory role). The government is required to establish by a preponderance of the evidence that Berry exercised control, United States v. Gonzales, 929 F.2d 213, 216 (6th Cir.1991), but the sentencing court's section 3B1.1 determination is a factual one and should not be upset unless clearly erroneous, United States v. Akrawi, 982 F.2d 970, 974 (6th Cir.1993). Further, specific findings are not required here because the sentencing judge presided over the trial. United States v. Richardson, 949 F.2d 851, 859 (6th Cir.1991).
 
 
 45
 There is plenty in the record to support the sentencing court's finding that Berry was at least a manager or supervisor (Sec. 3B1.1(b) = a three level enhancement), if not a leader or organizer (Sec. 3B1.1(a) = a four level enhancement). The sentencing court emphasized Berry's control over the money and the guns: while this does not alone amount to a supervisory role, it is circumstantial evidence of a managerial position. The evidence also reveals that Berry engaged actively in the negotiation process and participated in the initial decision to travel to Texas. Most telling perhaps was the part of Williams' testimony noted in part II of this opinion. Once in Texas, Berry telephoned Brown or "Mace" to get the funds necessary to complete the drug transaction. Williams testified that "[Berry] picked up the phone and called Mace. I don't know if he paged him or what, but Mace called back to the hotel room to Jed's [Berry's] room, and he told Mace to get that bag and come take the first flight out of Kentucky." (App. at 115) (emphasis added). It is apparent that Berry had at least some control over his co-conspirators.
 
 
 46
 For these reasons, the district court's judgment is affirmed.
 
 
 
 *
 The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation