714 So.2d 1233 (1998)
STATE of Louisiana
v.
Sarah Havely EDMONDSON.
No. 97-KK-2456.
Supreme Court of Louisiana.
July 8, 1998.
*1235 Richard P. Ieyoub, Atty. Gen., Scott M. Perrilloux, Dist. Atty., Zata W. Ard, Hammond, Donald J. Wall, Jr., Baton Rouge, for Applicant.
James E. Boren, J. Rodney Baum, Baton Rouge, for Respondent.
KNOLL, Justice.[*]
At issue in this case is the admissibility of an incriminating statement made by the defendant to Mississippi officials while she was awaiting trial for crimes committed in Louisiana. The defendant made the statement pursuant to an agreement with a Mississippi district attorney, who had agreed not to prosecute the defendant for crimes she committed in Mississippi in exchange for her cooperation in the prosecution of her accomplice for the Mississippi crimes. For the reasons which follow, we hold that the court of appeal erred in suppressing the statement defendant gave to Mississippi authorities.

FACTS
It is alleged that defendant, Sarah Edmondson, and her boyfriend, Benjamin Darras, engaged in a multi-state crime spree which culminated in the murder of William Savage in DeSoto County, Mississippi and in the armed robbery and attempted murder of Patsy Beyers in Ponchatoula, Louisiana. On March 7, 1995, Edmondson allegedly assisted Darras when he killed William Savage in the course of an armed robbery in Mississippi. On March 8, 1995, Edmondson allegedly shot and paralyzed Patsy Beyers in the course of an armed robbery of a convenience store in Ponchatoula, Louisiana.
Although the shooting of Patsy Beyers was captured on the convenience store's security monitor, Louisiana authorities were initially unable to locate a suspect. However, after Darras and Edmondson returned to their home state of Oklahoma, Louisiana authorities received an anonymous tip, implicating Darras in the Louisiana crimes. Darras was arrested, and on June 3, 1995, he gave a statement to Louisiana authorities in which he named Sarah Edmondson as the person who shot Patsy Beyers. Darras also directed police to a revolver and hooded sweatshirt allegedly used by Edmondson in the Louisiana crimes. At that time, Louisiana and Oklahoma authorities did not know of the murder of William Savage in Mississippi.
On June 15, 1995, the grand jury of Tangipahoa Parish indicted Edmondson with attempted first-degree murder, armed robbery, and use of a firearm during a crime of violence arising out of the Ponchatoula robbery. The indictment was later amended, reducing the charge to attempted second-degree murder. On June 22, 1995, Edmondson was taken into custody in Muskogee County, Oklahoma. She was extradited and transported to the Tangipahoa Parish Jail at Amite, Louisiana. Edmondson was read her Miranda rights when taken into custody in Oklahoma and when booked in jail in Amite.
On July 9, 1995, Steven Farese, Edmondson's Mississippi attorney, contacted Sammy Webb, an investigator with the district attorney's office in DeSoto County, Mississippi. Farese told Webb that he could provide information about the then unsolved murder of William Savage. At that time, Mississippi authorities had no leads in the Savage case.
Webb arranged a meeting between DeSoto County District Attorney Robert Williams and Farese at a cabin in Pickwick, Mississippi on July 14, 1995. At the meeting, Farese presented Williams with a form entitled "Agreement to Grant Transactional Immunity" which provided that an unknown witness (Edmondson) would not be prosecuted for the robbery and murder of William Savage in exchange for her cooperation and testimony *1236 regarding the Savage murder.[2] The Mississippi officials added two provisions to the agreement: that the witness cooperate fully in the investigation, and that the witness waive her right to any reward money offered in the Savage murder. After the agreement had been executed by Mississippi officials and approved by Mississippi Circuit Judge Andrew C. Baker, Farese informed the Mississippi officials of his client's identity and her location in the Tangipahoa Parish Jail. At the time the agreement was executed, the Mississippi officials were unaware of Edmondson's involvement in Louisiana crimes.
District Attorney Williams and Investigator Webb went to Tangipahoa Parish to interview Edmondson on July 15, 1995. As a courtesy, the Mississippi officials informed the Tangipahoa Parish District Attorney of the cooperation agreement and the interview. The Mississippi officials also met with members of the Ponchatoula Police Department and the Tangipahoa Sheriff's Office. According to Webb, the meetings provided the Mississippi officials with background information on Edmondson's Louisiana case to better assess her credibility. Webb also stated that information on Darras' involvement in the Louisiana crimes could be relevant in Darras' Mississippi trial.
Williams and Webb interviewed Edmondson at the jail in Amite on July 17, 1995. Just prior to the interview, Edmondson consulted with her Louisiana attorney by telephone. Her attorney advised full cooperation with the Mississippi officials, and he placed no restrictions on the interview. During the course of the interview, in addition to furnishing information about the Savage murder, Edmondson confessed to the shooting of Patsy Beyers. The contents of the statement were not given to Louisiana officials, but they were subsequently discovered when Mississippi officials leaked the statement to the press. When Louisiana authorities learned that Edmondson had made a statement to Webb concerning the Ponchatoula robbery, they informed her of their intent to introduce the statement into evidence at her Louisiana trial, both as "other crimes" evidence under La.Code Evid. art. 404(B) and as substantive evidence of her guilt. Edmondson objected, and filed a motion to suppress the statement.
The trial court ruled that the statement was voluntarily given after consultation with counsel and was therefore admissible, and it denied Edmondson's motion to suppress. Edmondson sought writs to the First Circuit Court of Appeal, which ultimately held that the statement was compelled under Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The First Circuit held that the statement was involuntary and inadmissible as other crimes evidence under La.Code Evid. art. 404(B)(1), and that Louisiana was prohibited from making any use of the statements or the fruits thereof as substantive evidence of Edmondson's guilt. State v. Edmondson, 97-0108 (La.App. 1 Cir. 7/28/97), 699 So.2d 882. This Court granted writs to address the admissibility of the Edmondson's statement.[3]
Before this Court, Edmondson asserts that her statement is inadmissible in that it was a non-voluntary statement which was compelled pursuant to a grant of transactional immunity. She notes that the immunity agreement itself reserves all rights against compulsory self-incrimination, and specifically provides that testimony given pursuant to the agreement is compelled. Edmondson argues that under Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the statement compelled under Mississippi's grant of immunity is inadmissible against her in both Louisiana and Mississippi. Edmondson further maintains that under Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), neither her compelled *1237 statement nor the fruits thereof are admissible in Louisiana. Edmondson therefore asserts that under Kastigar, the Louisiana prosecution must now show that all evidence it seeks to admit was obtained from a source independent of her compelled statement.
The State distinguishes both Kastigar and Murphy, noting that those cases dealt with defendants compelled to testify before a grand jury under a formal grant of statutory immunity. The State asserts that Edmondson's statement given in the case sub judice was voluntarily given under an informal agreement whereby the Mississippi district attorney agreed not to prosecute Edmondson in Mississippi in return for her cooperation in the prosecution of Darras for the murder of Savage. The State cites United States v. Roberson, 872 F.2d 597 (5th Cir.1989), cert. denied, 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989), in support of its argument distinguishing statements compelled by formal grants of immunity from statements given pursuant to informal immunity agreements.[4]

GRANTS OF IMMUNITY
The type of immunity granted to a witness, and the effect of that immunity on the admissibility of the witness' statements in a subsequent prosecution is initially dependent on the source of the immunity itself. There are essentially two sources of immunity: 1) formal, or statutory immunity and 2) informal, or "pocket immunity."
Statutory immunity is what may be granted by statute when a witness is summoned to testify at a trial or before a grand jury and refuses to do so by invoking his Fifth Amendment privilege against self-incrimination. The State, through the explicit authorization of an immunity statute, may then grant the type of immunity afforded by the statute, and may compel the recalcitrant witness' testimony, under penalty of contempt, and over the witness' invocation of his or her right to remain silent.[5] However, the immunity provided to the witness under the statute in order to compel his or her testimony must be at a minimum co-extensive with the asserted Fifth Amendment privilege which it has displaced. Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Therefore, the United States Supreme Court has held that where a witness' testimony is compelled through a statutory grant of immunity, prosecutorial authorities are prohibited from using the compelled testimony itself or the fruits derived from the testimony in a subsequent prosecution of the compelled witness. By preventing the use of the compelled statement in any respect, the immunity required by Murphy insures that the testimony cannot lead to the infliction of criminal penalties on the compelled witness. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); In re Parker, 357 So.2d 508 (La.1978).
Unlike formal statutory grants of immunity, however, where the Fifth Amendment is necessarily implicated, informal immunity agreements are "bargained for" immunity agreements in which the State agrees to limit its rights in prosecuting the defendant in return for the defendant's cooperation or testimony. In an informal immunity agreement, the State is not bound by the procedures and requirements of the immunity statute, and ordinary contract principles apply when interpreting the informal agreements. United States v. Plummer, 941 F.2d 799 (9th Cir.1991); United States v. Irvine, 756 F.2d 708 (9th Cir.1985). In contrast to statutory immunity, these informal agreements are contractual in nature and do not as a general proposition, bind prosecutorial authorities who are not a party to the agreement. United States v. Turner, 936 F.2d 221 (6th Cir.1991). Informal immunity agreements are enforced not because of the self-incrimination *1238 clause but because the due process clause requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves. United States v. Eliason, 3 F.3d 1149, 1153 (7th Cir.1993).[6]
The main distinguishing feature of an informal immunity agreement, as contrasted with a grant of statutory immunity, is that informal immunity cannot be unilaterally imposed by the State on a witness. Informal immunity, by its nature requires an agreement between a witness and prosecutorial officials. In contrast, testimony under a grant of statutory immunity is always compelled. This distinguishing characteristic was noted in United States v. Roberson, 872 F.2d 597 (5th Cir.1989), cert. denied, 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989), wherein the Court stated:
Patently, Murphy [which involved statutory immunity] is distinguishable from the instant case. In Murphy, the defendant was stuck between the proverbial rock and a hard place: He could testify, and incriminate himself, or he could invoke the fifth amendment and risk contempt charges. As a result, the defendant had no real choice but to testify, a result which would offend fifth amendment principles. Preserving the values underlying that amendment was critical to the Murphy court. To the contrary, in this case Roberson was not compelled to do anything. He bargained with the state, convincing it to forego state property offense charges and the death penalty in exchange for his cooperation. Roberson does not suggest that the state coerced him to accept the agreement or that he did not understand its terms; there is no reason why he could not have demanded federal immunity or refused to cooperate. Neither the state nor the federal prosecutor ever forced Roberson to incriminate himself; hence the interests that were critical to the Murphy court are not involved here.
Roberson, supra at 611.
Both Murphy and Kastigar concerned the ability of a sovereign to compel testimony under penalty of contempt and over the witness' assertion of Fifth Amendment privilege. Nevertheless, Murphy and Kastigar do not prohibit the use of all testimony given under cooperation agreements; they simply provide a witness with "immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom." Kastigar at 453, 1661 (emphasis added). In United States v. Camp, 72 F.3d 759 at 761 (9th Cir.1995), the Court noted: "The Murphy rule therefore applies only if the witness is compelled to testify. Otherwise there are no Fifth Amendment implications." In United States v. Eliason, 3 F.3d 1149, the Court stated:
Eliason makes the allegation that a grant of immunity from the state followed by the witness providing information to the state prosecutor is sufficient to automatically trigger the protections of Kastigar and Murphy in a subsequent federal prosecution. Not surprisingly, the defendant overlooks the essential factor necessary to invoke the right to a Kastigar hearing: compulsion. The record is barren of any allegation much less evidence that the state authorities compelled Eliason to provide information to them, i.e., he neither provided testimony under subpoena nor under a threat of contempt.
Eliason, supra at 1153. (Emphasis original). See also, State v. Wallace, 321 So.2d 349 (La.1975), (on rehearing); United States v. McHan, 101 F.3d 1027 (4th Cir.1996); Roberson, supra; Irvine, supra; Turner, supra; Plummer, supra.
Simply stated, statutory compulsion is necessary to trigger the protections of Kastigar and Murphy. In the instant case, neither Louisiana nor Mississippi sought to compel Edmondson's testimony. There is no evidence *1239 that Edmondson was subpoenaed or otherwise threatened with contempt for her refusal to make a statement. The record clearly establishes that Edmondson pursued and received an informal agreement that she would not be prosecuted in the murder of William Savage in exchange for her cooperation in prosecuting her accomplice for that murder. Such an informal agreement does not automatically trigger the constitutional safeguards required by Murphy and Kastigar.[7] We therefore hold that the court of appeal erred in determining that Edmondson's statement was compelled under Murphy, and that under Kastigar, the State was prohibited from using the statement or any fruits thereof.

VOLUNTARINESS
Although Edmondson's cooperation agreement with Mississippi authorities does not trigger the automatic applications of Murphy and Kastigar, her statement must be suppressed if it is found to be involuntary. Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; U.S. Const. amend. V.
Whether a statement is voluntary is determined by the totality of the circumstances under which the statement was given. The totality of the circumstances inquiry requires the reviewing court to investigate and analyze both the characteristics of the accused and the details of the investigation. Under this test, the ultimate question to be answered is whether the statements were the product of an essentially free and unconstrained choice or the result of an overborne will State v. Lewis, 539 So.2d 1199 (La. 1989).
The admissibility of a confession is, in the first instance, a question for the trial court, and its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless clearly unsupported by the evidence. State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366; State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382.
In Bram v. United States, 168 U.S. 532,18 S.Ct. 183, 42 L.Ed. 568 (1897), the Court stated that a confession is involuntary if "obtained by direct or implied promises, however slight, nor by the exertion of any improper influence." Nevertheless, in State v. Lewis, supra, we noted:
This rule, while oft-cited, has not been liberally applied. United States v. Long, 852 F.2d 975, 977 (7th Cir.1988). Instead, "a review of the totality of the circumstances under which the statement was given is still required and any inducement offered to the defendant is but one fact, albeit an important one, in that analysis." Id.
Lewis, supra at 1201-02.
We find that under the totality of the circumstances, the statement was voluntary. It was Edmondson who, through counsel, approached the Mississippi authorities at a time when there were no leads in the Savage murder. At that time Edmondson was under no obligation to detail her activities in either *1240 state, and was subject to no penalty for maintaining her silence. Her failure to come forward would simply result in the murder of William Savage remaining unsolved. See U.S. v. Camp, supra.
Typically, where both sides gain, or have potential to gain, something from an exchange, and where no fraud or force is involved, the transaction is deemed voluntary.[8] In the instant case, Edmondson voluntarily exchanged her testimony for the valuable consideration offered by Mississippi. The immunity agreement itself details her extensive involvement in the murder and robbery of William Savage, a crime which she cannot be prosecuted for under the agreement. In addition, Edmondson had an incentive to quickly strike an immunity agreement before Darras could do the same, especially considering Darras' apparent willingness to cooperate in the Louisiana case against her. Edmondson and her defense team were simply attempting to negotiate the best possible deal with Mississippi authorities while their leverage in the Mississippi case remained high.
Edmondson gave a statement to Mississippi officials pursuant to an arm's length agreement entered into on her own initiative and for her own purposes. She was free to negotiate conditions that could not be imposed on her by Mississippi had she exercised her Fifth Amendment privilege. Edmondson, who initiated the negotiations and drafted the agreement, could have included a provision requiring that the Mississippi authorities keep confidential any statement she made. However, the agreement contained no provision which required Mississippi officials to refuse to disseminate the statement to other law enforcement authorities. See United States v. Turner, 936 F.2d 221 (6th Cir.1991). Mississippi officials never represented to her that her cooperation would do anything more than shield her from prosecution in Mississippi, and Edmondson certainly realized that her agreement with Mississippi authorities could not immunize her from prosecution for her Louisiana crimes. There is no indication that Mississippi did not abide by the agreement which it struck with Edmondson.
The record reflects that the interview was conducted on an amicable basis, and no threats or force were directed at Edmondson in order to compel her testimony. Edmondson was represented by a team of lawyers from Louisiana, Mississippi, and Oklahoma, and she consulted with her Louisiana counsel just before she gave her statement to the Mississippi authorities. In a telephone conversation minutes before the interview began, Edmondson's Louisiana counsel placed no restrictions on her questioning. While the defendant may have had her own compelling reasons to make a statement, such compulsion was neither created by Louisiana or Mississippi, nor did those states take advantage of "certain cruel choices, and choices made in highly coercive circumstances" to unfairly elicit the incriminating testimony from the defendant. Deering v. Brown, 839 F.2d 539, 543 (9th Cir. 1988). We find that Edmondson's own failure to foresee that her statement would be valuable to the Louisiana prosecution, and her failure to limit her statement to her knowledge of Mississippi crimes only is the direct cause of her present situation.
There is absolutely no evidence that Louisiana and Mississippi officials cooperated in an attempt to obtain a confession from Edmondson by trickery. Apart from giving Mississippi authorities a factual background on Edmondson's Louisiana crimes, there was no cooperation between the two states. Louisiana has done nothing more than utilize a statement procured by a separate and independent governmental body.
We are unconvinced by Edmondson's argument that under the provisions of the cooperation agreement itself, the statement was *1241 compelled.[9] We note that the primary cause for the agreement was a waiver of Edmondson's Fifth Amendment rights in exchange for the Mississippi officials' promise not to prosecute her. One cannot waive a right, while simultaneously asserting the same right. Edmondson's assertion of her Fifth Amendment rights would be evidenced by her refusal to make a statement, not by her granting an interview with prosecutorial officials. In Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) the Court stated:
Thus it is that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself. If he asserts the privilege, he "may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without at that time being assured that neither it nor its fruits may be used against him" in a subsequent criminal proceeding. But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so.
Minnesota v. Murphy, supra at 429, 104 S.Ct. at 1143 (Citations omitted).
We note that the statement was intended to be plainly voluntary for the purpose of its use in the Mississippi proceedings, and we see no reason to hold that it is somehow compelled when applied to Louisiana. Either the testimony was voluntary or it was not. Once the privilege against self-incrimination is effectively waived, then the information given is admissible as evidence at any subsequent trial. United States v. Long, 852 F.2d 975, 978-9 (7th Cir.1988); State v. Wallace, 321 So.2d 349 (La.1975), on rehearing.
In support of her argument that her statement was compelled, Edmondson cites the Mississippi district attorney's right to unilaterally void the immunity agreement as a looming threat that rendered her statement involuntary. There is no evidence in the record that Mississippi officials threatened to terminate the agreement with Edmondson during the interview when she gave her statement. Furthermore, it is not a foregone conclusion that the defendant's refusal to answer questions about separate Louisiana crimes would have allowed the Mississippi district attorney to void the agreement. Any immunity agreement made by the government must be scrupulously performed and kept. United States v. Lyons, 670 F.2d 77, 80 (7th Cir.), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
The objective circumstances of this case stand in stark contrast to those where compelled statements are typically found. Here the defendant was not only represented by counsel, but had retained counsel in three different states. The defendant's waiver of her privilege against self-incrimination was voluntary, intelligent, and with benefit of counsel. We cannot say that the trial court's determination that Edmondson's statement was voluntary is clearly unsupported by the evidence. To the contrary, the totality of the circumstances reflects that her testimony was a voluntary and bargained for element of her agreement with Mississippi officials.

DECREE
For the foregoing reasons, the ruling of the First Circuit Court of Appeal, granting defendant's motion to suppress is reversed and set aside. This case is remanded to the Twenty-First Judicial District Court for further proceedings consistent with the views expressed in this opinion.
REVERSED AND REMANDED.
CALOGERO, C.J., dissents and assigns reasons.
LEMMON, J., dissents and assigns reasons.
*1242 CALOGERO, Chief Justice, dissenting.
For the following reasons, I respectfully dissent.
Sarah Edmondson, through her attorney, negotiated an immunity agreement with the Mississippi prosecutorial officials in which she was provided the following in exchange for her cooperation with the investigation and her testimony:
This agreement prohibits any prosecution related to the transaction, irrespective of whether there is an independent source for the evidence.... It is understood that the testimony given under this agreement will be non-voluntary and compelled. The witness, Sarah Havely Edmondson, will continue to assert his/her Fifth Amendment Rights and State Constitutional rights against compulsory self-incrimination. (emphasis added).
It is undisputed that Sarah Edmondson was not granted formal statutory immunity. However, "[A] witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute." Adams v. Maryland, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954). Edmondson, in effect, contracted with the Mississippi officials that she would be provided the same protections as if she had in fact been granted formal statutory immunity for her statement in addition to transactional immunity for her person. Under the specific terms of her agreement, which were accepted by the Mississippi officials, Edmondson was led to believe that she would also be granted use plus derivative use immunity for her statements, made over continuing assertion of her Fifth Amendment privilege, which would be binding on other jurisdictions. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Additionally, as a predicate for her immunity, Edmondson was to provide to the Mississippi authorities, "certain information, specifically, but not limited to" the murder of William Savage. (emphasis added). The agreement further provided, as was requested by the Mississippi officials:
It is expressly understood and agreed that if Sarah Havely Edmondson does not cooperate fully with the District Attorney, Robert H. Williams, then said District Attorney in his sole discretion has the absolute authority to cancel this agreement and declare it void and take any action against said Sarah Havely Edmondson that the District Attorney in his sole discretion chooses to take.
This provision compelled Edmondson to answer questions pertaining to the Louisiana crimes, which no doubt followed her incriminating answers to questions pertaining to the Mississippi murder. A refusal to answer questions directed towards the Louisiana crimes would have been seen as a failure to cooperate and would have violated the terms of the immunity agreement. Therefore, had she invoked her Fifth Amendment privilege when asked about the Louisiana crimes, she risked repudiation of the immunity guarantee after she had already implicated herself in the Mississippi murder. Significantly, because the same murder weapon was used in crimes occurring over a two-day period and William Savage's wallet was disposed of in the Ponchatoula area, the crimes were so interconnected that Edmondson could not help but implicate herself in the Ponchatoula crime if she was indeed to provide full cooperation with the Mississippi officials as the immunity agreement required. Both the terms of the agreement and the close connexity of the two crimes rendered questions pertaining to the Louisiana crimes within the scope of the immunity agreement and its provision which required her full cooperation regarding the Savage murder and its related events. Therefore, Edmondson's truthful response to questions pertaining to the Louisiana crimes was an express precondition of the agreement. But cf. Hutto v. Ross, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (holding that a plea-bargain that was not contingent upon defendant's confession rendered defendant's subsequent inculpatory statement to the police officials voluntary).
In these respects, the instant case is analogous to this Court's previous decision in *1243 State v. Lewis, 539 So.2d 1199 (La.1989), which held the defendant's statement to be compelled by the grant of immunity. In Lewis, the defendant gave an inculpatory statement under an immunity agreement entered into with Rapides Parish officials. Avoyelles Parish sought to use the statement against Lewis for crimes allegedly committed in Avoyelles Parish. Pursuant to the immunity agreement, Lewis was required to confess, "any and all related criminal offenses taking place within the jurisdiction of the United State of America and/or under the jurisdiction of the state of Louisiana...." In exchange for this testimony, the state promised that, "Anything, whatsoever, that JIMMIE LEWIS communicates and/or conveys to law enforcement officers, in connection with this plea agreement, will not be used against him, nor any derivative evidence obtained as a result of his cooperation will be used against him." Lewis, 539 So.2d at 1205.
In Lewis this Court stated, "While defendant might have expected he could be subject to subsequent prosecution in another jurisdiction, this promise assured him that any evidence he gave would not be used against him. It is contrary to reason to believe he would have given evidence against himself had he believed such evidence could later be used against him. Instead, he gave evidence in exchange for the state's promise of immunity and, thus, the statements were not voluntary." Lewis, 539 So.2d at 1205. Applying the totality of the circumstances test, this Court concluded that the statement was compelled, and that, therefore, under Kastigar, the statement must be afforded use plus derivative use immunity even in the non-immunizing jurisdiction of Avoyelles Parish. Id. at 1205-06.
Similarly, Edmondson's statements "arose out of and were demanded by the agreement [she] made in an arm's-length negotiation with the [S]tate [of Mississippi]." Id. at 1205. The Louisiana crimes were so interconnected with those of Mississippi that her full cooperation with the Mississippi investigation would have been impossible had she refused to respond to that line of questioning. Moreover, the agreement stipulated that her statement was compelled, and that she would continue to assert her Fifth Amendment privilege against self-incrimination.[1] Edmondson had never spoken with police authorities prior to that time, had invoked her right to counsel, and had attorneys in three states. These factors are further evidence that she had no intention of waiving her Fifth Amendment privilege. Also significant is the fact that Louisiana law enforcement officials participated in, and were aware of, the Mississippi activities surrounding the taking of Edmondson's statement. See U.S. v. Long, 852 F.2d 975, 976 (7th Cir.1988) (finding that the absence of federal prosecutorial knowledge of and participation in the state prosecution of the defendant further supported the characterization of defendant's inculpatory statement as being voluntary). Louisiana law enforcement officials provided the Mississippi officials with key facts relating to the Louisiana crimes in order to facilitate the Mississippi investigation, and they in turn were briefed about Edmondson's possible involvement in the Savage murder as well as her cooperation agreement with the Mississippi authorities.
Under the facts and circumstances specific to this case, Edmondson's statement to Mississippi officials cannot be construed as voluntary. As a compelled statement, it is entitled to the protections co-extensive with the Fifth Amendment privilege against compulsory self-incrimination, and, therefore, it is afforded use plus derivative use immunity. Under my reading of Murphy, supra, these protections are binding on Louisiana by virtue of the Fifth Amendment. Therefore, Louisiana should be prohibited from using that statement, or any fruits derived therefrom, as either direct evidence of Edmondson's guilt or as other crimes evidence under La.Code of Evidence article 404B(1).
*1244 LEMMON, Justice, dissenting.
I disagree that defendant's statement was not compelled.[1] Under the transactional immunity agreement, the Mississippi district attorney had the right to cancel the promised immunity if defendant did not "cooperate fully." The Mississippi authorities questioned defendant under the agreement, first asking her about the Mississippi crime, and she answered fully, being compelled to do so (despite her earlier assertion in the agreement of her privilege against self-incrimination) in order to maintain the immunity promised under the agreement. When the Mississippi authorities further questioned her about the Louisiana crime (which was potential penalty phase evidence for the capital trial in Mississippi), defendant continued to be compelled to answer those questions or risk the loss of the immunity.
The majority's characterizing the answers to the questions about the Louisiana crimes (for which information had been furnished by the Louisiana authorities) as "voluntary," while apparently accepting the answers concerning the interrelated Mississippi crime as "compelled," is an illusory distinction that escapes me.
Neither do I perceive any significant basis for a distinction in the enforcement of use plus derivative-use immunity between immunity granted by a statute and that which flows from an informal agreement. A grant of immunity displaces the right of the person to refuse to testify. 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 8.11(a) (1984). Whether the immunity is conferred by statute or by agreement,[2] the person's loss of the right to refuse to testify compels the person to testify. The fact that the person sometimes initiates negotiation of the informal agreement does not necessarily make testimony under the agreement voluntary rather than compelled.[3]
Moreover, the grant of immunity is intended to place the person in the same position as if he or she had not testified, Murphy, supra, and the grant of immunity must be coextensive with the scope of the privilege against self-incrimination, Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).[4] A person who loses the privilege against self-incrimination, whether by statute or by agreement, must be assured that the immunity coextensive with the scope of the privilege precludes any use of the statements and the fruits derived from the statements.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, Sec.3.
[2] The agreement, as initially presented to Mississippi officials, was incomplete. The parts of the document providing the identity of the immunized party were left blank, and would be filled in by Farese after the agreement was executed by the Mississippi officials.
[3] State v. Edmondson, 97-2456 (La.2/20/98), 709 So.2d 763.
[4] We note that the State has also distinguished Murphy and Kastigar on the basis that those cases involved a single set of criminal circumstances occurring in overlapping jurisdictions, namely state and federal. In the instant case, there were two distinct criminal acts, each committed in a separate, non-overlapping jurisdiction. However, because we find that Murphy and Kastigar are not triggered under the facts of the instant case, we pretermit for another day a discussion on this issue.
[5] See, for example, La.Code Crim. P. art. 439.1
[6] For an excellent discussion of the importance of maintaining the distinctions between grants of statutory immunity, plea bargains, and informal cooperation agreements, See Butler v. State, 55 Md.App. 409, 462 A.2d 1230 (1983).
[7] Moreover, Kastigar specifically addresses the issue in the instant case, namely the distinction between a statement compelled under statutory immunity and a statement coerced by prosecutorial inducements. The Court stated:

The statutory proscription is analogous to the Fifth Amendment requirement in cases of coerced confessions. A coerced confession, as revealing of leads as testimony given in exchange for immunity, is inadmissible in a criminal trial, but it does not bar prosecution. Moreover, a defendant against whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced confession claim. One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources. On the other hand, a defendant raising a coerced-confession claim under the Fifth Amendment must first prevail in a voluntariness hearing before his confession and evidence derived from it become inadmissible.
Kastigar, supra at 461-62, 92 S.Ct. at 1665. (Footnotes omitted).
[8] In United States v. Escandar, 465 F.2d 438, 442 (5th Cir. 1972), the Court noted:

The hallmark of compulsion is the presence of some operative force producing an involuntary response. Compulsion is not present where the act proceeds from the exercise of choice or free will, self-impelled and freely undertaken, and unconstrained by interference. And, of course, the response must be free from improper influences (e.g., fear, ignorance, trickery, etc.) such as would render it less than the exercise of unfettered free will.
[9] The agreement states:

It is understood that the testimony given under this agreement will be non-voluntary and compelled. The witness, Sarah Havely Edmondson, will continue to assert his/her Fifth Amendment Rights and State Constitutional Rights against compulsory self-incrimination.
[1] The majority notes that other jurisdictions have held certain informal immunity agreements to be voluntary and, therefore, not binding on subsequent prosecutions. See Camp, 72 F.3d at 761; Eliason, 3 F.3d at 1153. This case is distinguishable, however, in that Edmondson continued to invoke her Fifth Amendment privilege, a fact that was absent in Camp and Eliason, supra.
[1] A person may not be compelled to give incriminating testimony in one jurisdiction unless the compelled testimony and its fruits cannot be used against the person in a criminal prosecution in another jurisdiction. Murphy v. Waterfront Com'n of N.Y. Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).
[2] An immunity agreement is not a typical bilateral contract between two parties with equal arguing power.
[3] Several courts have held that testimony given under an informal grant of immunity may be excluded on the basis of the traditional standards applied to confessions induced by promises. LaFave, supra, at § 8.11(d).
[4] Kastigar was a pro-government decision which held that use plus derivative-use immunity, and not transactional immunity (as argued by the defendant), was required as a result of the loss of the privilege.