10-3424-cr(L)
United States v. Davis

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: June 18, 2012     Decided: August 8, 2012)

Docket Nos. 10-3424-cr (L); 10-3453-cr (CON)

UNITED STATES OF AMERICA,

*Appellee*,

v.

ALTON DAVIS, RODERICK GUNN, A/K/A ZAPPA,

*Defendants-Appellants*,

DERRILYN NEEDHAM, A/K/A INGRID,
RONALD KNIBBS, A/K/A BIRDIE,

*Defendants*.

Before:

LEVAL, RAGGI, and CHIN, *Circuit Judges*.

Appeal from judgments of conviction entered after a jury trial in the United States

District Court for the Southern District of New York (William H. Pauley III, *Judge*), on

charges of conspiring and attempting to commit Hobbs Act robberies, see 18 U.S.C.

§ 1951; using firearms in relation to the attempted robberies, on two occasions causing death, see 18 U.S.C. § 924(c)(1)(A), (j); and conspiring to distribute more than 100 kilograms of marijuana, see 21 U.S.C. §§ 841(a)(1), (b)(1), 846. By summary order filed today we reject most of appellants' challenges to these convictions. This opinion addresses Davis's challenge to venue in the Southern District of New York for a substantive Hobbs Act count and two firearms counts pertaining to the attempted robbery of a residence in the Eastern District of New York.

AFFIRMED.

---

JOHN J. O'DONNELL (Jennifer E. Burns, Iris Lan, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

ANDREW M. ST. LAURENT, Harris, Cutler & Houghteling LLP, New York, New York, *for Defendant-Appellant Alton Davis.*

HOWARD L. JACOBS (Jeremy B. Sporn, *on the brief*), New York, New York, *for Defendant-Appellant Roderick Gunn*.

---

REENA RAGGI, *Circuit Judge*:

Defendants Alton Davis and Roderick Gunn appeal from judgments entered against them on August 24, 2010, in the United States District Court for the Southern District of New York (William H. Pauley III, *Judge*), convicting them of conspiracy to commit Hobbs Act robberies of suspected drug dealers, see 18 U.S.C. § 1951 (Count

One); attempting to commit such a robbery on Wickham Avenue in the Bronx ("Wickham robbery"), see id. (Count Three); two counts of using and discharging a firearm during the Wickham robbery, including causing the death of Gary Grey, see id. § 924(c)(1)(A)(iii), (j) (Counts Six and Seven); and conspiracy to distribute and possess with intent to distribute more than 100 kilograms of marijuana, see 21 U.S.C. §§ 841(a)(1), (b)(1), 846 (Count Eight). Davis also appeals his convictions for attempting to commit a Hobbs Act robbery in Elmont, Long Island ("Elmont robbery"), see 18 U.S.C. § 1951 (Count Two), and two counts of using and discharging a firearm during the Elmont robbery, including causing the death of Stephanie Laing, see id. § 924(c)(1)(A)(iii), (j) (Counts Four and Five).

In this opinion, we explain why we reject Davis's challenge to venue in the Southern District of New York for Counts Two, Four, and Five, the Hobbs Act and firearms counts relating to the Elmont robbery. By separate order filed today, we summarily reject defendants' remaining challenges to their convictions. Accordingly, we affirm the challenged judgments in all respects.

I.    Factual Background

    A.    Defendants' Criminal Conduct

        1.    The Robbery Scheme

Over the course of an eight-day trial, at which approximately 40 witnesses testified, the prosecution proved that between mid-2002 and early 2003, defendants Davis

3

and Gunn, along with others, participated in a conspiracy to rob suspected drug dealers of money and drugs. Of the six robberies or attempted robberies about which evidence was introduced, three occurred in the Bronx, one in Queens, one on Long Island, and one in Maryland. During the Maryland robbery, in which Davis, but not Gunn, participated, approximately $1,000,000 was stolen. In committing robberies, one or more of the conspirators usually was armed with a gun, such that during the Elmont robbery, which targeted a Bronx drug dealer named Robert DeLeon, Davis shot and killed DeLeon's common-law wife, Stephanie Laing, and during the Wickham robbery, Davis shot and killed the robbery target, Gary Grey. Insofar as this opinion focuses on Davis's venue challenge to the substantive counts pertaining to the attempted Elmont robbery, we limit our further discussion of facts to those charges.

### 2. The Elmont Robbery

In the fall of 2002, Gunn spoke with confederate Derrilyn Needham about robbing "Bobby Sox," whom he identified as a "big-time drug dealer." Trial Tr. 373, 380. Gunn directed Needham to locate "Bobby Sox," whose real name was Robert DeLeon, and to secure his license plate number.[1] Sometime thereafter, Needham spotted DeLeon in a car parked on White Plains Road in the Bronx. After Needham copied DeLeon's license

---

[1] Needham, who testified for the prosecution, admitted that she had been robbing drug dealers since 2001, confident that such targets would not contact the police. She would provide information about likely targets to the crew that actually committed the robberies. Sometimes, she would herself go to the robbery location. In return, she would receive a share of the proceeds.

plate number, she and Gunn enlisted a contact with access to records from the New York State Department of Motor Vehicles to "run" the plate. Id. at 377. The conspirators thus learned that the vehicle was registered to Stephanie Laing at 194 Locustwood Boulevard in Elmont, Long Island, within the Eastern District of New York. Together with three other persons, Gunn surveyed the Elmont address and concluded that a robbery "was doable." Id. at 380–81. Lacking confidence in his cohort, however, Gunn asked Needham to secure Davis's participation in the robbery, which she did. At this point in the conspiracy, Davis had already participated with Gunn and Needham in one successful robbery in the Bronx, as well as in failed robbery attempts in the Bronx and Queens. He had also participated successfully with Needham in the Maryland robbery.

Testifying for the prosecution, Robert DeLeon stated that in the summer and fall of 2002, he lived with Stephanie Laing and their children at 194 Locustwood Boulevard in Elmont. During that time, he sold large quantities of marijuana in the Bronx and Manhattan. DeLeon explained that, approximately three times per month, he received 500 to 800 pounds of marijuana from California at his Elmont home. There, he would break down the shipments into smaller packages that he personally delivered in his car to customers in the Bronx and Manhattan approximately "six times a week." Id. at 238–39. DeLeon would bring the money earned from these transactions back to Elmont. On October 31, 2002, the date of the planned robbery, DeLeon had neither drugs nor large amounts of money in his Elmont home, having received and distributed a shipment of marijuana the week before.

Early on the morning of October 31, Davis armed himself with a .45 caliber handgun and went to the targeted residence to commit the robbery. Not finding either Gunn or another confederate—each of whom was supposed to serve as a lookout—at the scene, Davis called Needham at her home in the Bronx and asked her to contact the two missing men to find out where they were. Needham did so and reported back to Davis that neither man could participate in the robbery that morning. Davis then asked Needham to come to Elmont and herself serve as lookout. She replied that she could not do so but offered to call "Tammy," who agreed to provide the needed assistance. Thereafter, at least three persons joined Davis to carry out the Elmont robbery.

On the morning of October 31, DeLeon was home with Laing and the couple's two children. Also present in the house were DeLeon's mother and sister. As part of the morning routine, DeLeon's daughter went outside to warm up DeLeon's car. As she reentered the house, Davis came up behind her and forced his way inside. Laing screamed when she saw the intruder and ran upstairs, with Davis in pursuit. Hearing the scream, DeLeon grabbed a Glock .40 caliber handgun from his bedroom, confronted Davis, and shot him in the right shoulder. DeLeon then ran downstairs, where he chased and fired at the other robbers. Meanwhile, the wounded Davis entered the bedroom where Laing had sought refuge with DeLeon's mother, Eneta Brown. Brown saw Davis lean over to say something to Laing—which Brown could not hear—whereupon Davis

6

shot Laing, first in the eye and then in the chest, killing the woman. Davis also tried to shoot Brown, who was trying to hide under the bed, but his gun misfired.

Together with his confederates, Davis then fled the scene, going first to a cousin's home in Brooklyn and then to a Brooklyn hospital for treatment of the gunshot wound to his shoulder. When local police detectives reported to the hospital to investigate the shooting, he falsely reported being the victim of a street dispute in Brooklyn. In fact, later that day, he would tell a group of persons, including Needham, about the events in Elmont. Needham testified that Davis sounded "almost boastful" in relaying his killing of Laing. Id. at 395. Thereafter, he would also tell Needham that he planned to kill Bobby Sox, i.e., DeLeon, for shooting him.

Although Davis never achieved that murderous objective, in the course of the January 2003 attempted Wickham robbery, in which he participated with Gunn and Needham, Davis shot and killed robbery target Gary Grey. Davis had decided the night before the robbery to murder Grey in order to prevent him from retaliating against the person who gave the robbers entry into his home.

Following his March 2007 arrest by federal and state officials, Davis admitted being present during the attempted Elmont robbery, being fired upon, and shooting back, but claimed to have done so only reflexively, not intending to kill Laing.

7

B.      The District Court's Rejection of Davis's Venue Challenge

1.      The Government's Venue Argument and the Court's Jury Charge

In its summation to the jury, the government argued that venue in the Southern District of New York for the crimes related to the attempted Elmont robbery was supported by (1) Needham's procurement in the Bronx of the target's license plate number; (2) Needham's efforts, in response to Davis's October 31, 2002 telephone call, to secure people to help Davis commit the robbery; and (3) the robbery's effect on interstate commerce in the Bronx, where the robbery target dealt drugs.

In its charge to the jury, the district court stated that venue for "robbery or attempted robbery . . . is proper in any district where interstate commerce is affected or where the acts in furtherance of the robbery or attempted robbery took place." Id. at 1826. This language was taken almost verbatim from the parties' joint proposed jury charge.

2.      Davis's Rule 29 Challenge to Venue

Prior to trial, Davis moved unsuccessfully to dismiss the Hobbs Act and firearms counts relating to the attempted Elmont robbery, arguing that venue for these three crimes was lacking in the Southern District of New York. Davis renewed the venue challenge toward the close of evidence, moving for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. After the verdict, the district court denied the motion, identifying two "acts in furtherance of the attempted robbery" that had taken place in the Southern District:

8

(1) Needham's procurement of DeLeon's license plate number in the Bronx, "the key act enabling the robbery crew to locate DeLeon's house"; and (2) Needham's calling "Tammy" from the Bronx to act as a lookout, which action "allow[ed] the crime to go forward." United States v. Davis, No. 06 CR 911 (WHP), 2010 WL 3306172, at *2 (S.D.N.Y. Aug. 20, 2010). The district court further concluded that, with venue in the Southern District thus established "for the underlying crime of violence," it necessarily followed that venue in the Southern District was also established for the related § 924 firearms crimes. Id. (citing United States v. Rodriguez-Moreno, 526 U.S. 275, 282 (1999)).

C.     Davis's Sentence and Appeal

The district court proceeded to sentence Davis to concurrent prison terms of 20 years on the Hobbs Act conspiracy (Count One), 20 years on the attempted Elmont robbery (Count Two), 20 years on the attempted Wickham robbery (Count Three), life on the use and discharge of a firearm during the attempted Elmont robbery resulting in death (Count Five), life on the use and discharge of a firearm during the attempted Wickham robbery resulting in death (Count Seven), and 40 years on the conspiracy to traffic in more than 100 kilograms of marijuana (Count Eight). The district court also imposed concurrent terms of lifetime supervised release on each count of conviction and a total special assessment of $800. This timely appeal followed.

9

## II.     Discussion

Davis contends that the district court erred in rejecting his venue challenge to the three substantive counts of conviction pertaining to the attempted Elmont robbery (Counts Two, Four, and Five).  He maintains that the evidence is insufficient as a matter of law to permit venue for these crimes to have been found in the Southern District of New York.  Because Davis is serving concurrent life sentences for shooting and killing persons in the Wickham robbery as well as the Elmont robbery, and because proof of the Elmont robbery and the related firearms charges was properly admitted to prove the overall Hobbs Act conspiracy charge, it is doubtful that he would realize any practical benefit from a successful venue challenge to the counts of conviction pertaining to the Elmont robbery.  Nevertheless, because we recognize that the fact of concurrent sentences on two counts does not moot a challenge to one count, see Ball v. United States, 470 U.S. 856, 864–65 (1985), we proceed to address Davis's venue challenge, and we conclude that it is meritless.

### A.     The Venue Requirement

A defendant's right to be tried in the state and district in which the charged crime "shall have been committed" is grounded in two provisions of the Constitution, see U.S. Const. art. III, § 2, cl. 3; id. amend. VI, and reiterated in Fed. R. Crim. P. 18.  The requirement derives from colonial grievances against the Crown, which had sometimes transported American colonists across the sea to stand trial in England.  See Drew L.

Kershen, Vicinage, 29 Okla. L. Rev. 801, 807 (1976) (noting specific reference to this grievance in Declaration of Independence). Thus, the Constitution's venue requirement was adopted to shield a federal defendant from "the unfairness and hardship" of prosecution "in a remote place." United States v. Cores, 356 U.S. 405, 407 (1958); see 3 J. Story, Commentaries on the Constitution of the United States § 1775, at 654 (photo. reprint 1999) (Boston, Hilliard, Gray & Co. 1833) (observing that object of Constitution's vicinage clause is to prevent "accused from being dragged to a trial in some distant state").

Despite its constitutional pedigree, venue is not an element of any crime, so as to require proof beyond a reasonable doubt. Rather, venue need be proved only by a preponderance of the evidence. See United States v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011); United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007) (collecting cases).[2] The sufficiency of the evidence to support a preponderance finding of venue is a question of law that we review de novo, considering the evidence in the light most favorable to the government. United States v. Tzolov, 642 F.3d at 318.

_____

[2] Indeed, because venue is not an element of a crime, a question might be raised as to whether venue disputes must, in fact, be submitted to a jury. See United States v. Rommy, 506 F.3d at 119 n.5 (noting issue without deciding it); United States v. Hart-Williams, 967 F. Supp. 73, 76–78 (E.D.N.Y. 1997) (concluding that venue need not be decided by jury and collecting cases). As in Rommy, no such question was raised in this case, and thus we do not attempt to answer it here.

Where, as here, a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989). In considering whether the government has carried this burden, we begin by determining the locus delicti of the particular crime at issue, employing the two-step analysis set forth in United States v. Rodriguez-Moreno, which seeks first to "identify the conduct constituting the offense," and then to "discern the location of the commission of the criminal acts." 526 U.S. at 279–80; see also United States v. Cabrales, 524 U.S. 1, 6–7 (1998) ("[T]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it."); United States v. Ramirez, 420 F.3d 134, 138 (2d Cir. 2005). Although statutory language necessarily informs the first step of the analysis, the Supreme Court has "rejected a rigid 'verb test' that 'unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.'" United States v. Saavedra, 223 F.3d 85, 90 (2d Cir. 2000) (quoting United States v. Rodriguez-Moreno, 526 U.S. at 280).

Similarly, at the second step, the law recognizes that not all crimes consist of a single, non-continuing act, so as to locate venue in a single district. See United States v. Ramirez, 420 F.3d at 139. "The commission of some crimes can span several districts." United States v. Rommy, 506 F.3d at 119. In such circumstances, Congress has

instructed that venue properly lies in "any district" in which the charged offense "was begun, continued, or completed." 18 U.S.C. § 3237(a).

To comport with constitutional safeguards, we have construed this language to require more than "some activity in the situs district"; instead, there must be "substantial contacts," considering "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985); accord United States v. Royer, 549 F.3d 886, 895 (2d Cir. 2008). Further, to support venue, what is begun or continued in a district must be a part of the actual charged crime, not merely steps preparatory to the crime. See United States v. Tzolov, 642 F.3d at 319; United States v. Beech-Nut Nutrition Corp., 871 F.2d at 1190.

Finally, there must be some "sense of [venue] having been freely chosen" by the defendant. United States v. Reed, 773 F.2d at 481. This does not mean that evidence must show that a defendant had actual knowledge that particular acts would occur in a particular district to support venue at that location. Rather, it asks whether the acts' "occurrence in the district of venue [would] have been reasonably foreseeable" to the defendant. United States v. Rommy, 506 F.3d at 123.

With these principles in mind, we consider Davis's venue challenge.

13

B.      The Conduct Constituting the Crimes of Conviction

Although Davis challenges venue on three counts of conviction—the Hobbs Act attempted Elmont robbery (Count Two), § 924(c)(1) use of a firearm in furtherance of the Elmont robbery (Count Four), and § 924(j) use of a firearm in furtherance of the Elmont robbery resulting in death (Count Five)—we need focus only on the Hobbs Act count in light of Supreme Court precedent holding that "[w]here venue is appropriate for the underlying crime of violence," it is also appropriate for related § 924 firearms offenses committed in furtherance of the act of violence.  United States v. Rodriguez-Moreno, 526 U.S. at 282.

In identifying the "conduct constituting" the charged Hobbs Act offense, id. at 279, we begin with the statutory text.  The Hobbs Act prohibits, among other things, "in any way or degree obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by robbery or extortion."  18 U.S.C. § 1951(a).  The statute defines "robbery" to mean "the unlawful taking or obtaining of personal property from the person or in the presence of another . . . by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property."  Id. § 1951(b)(1).  Because the Hobbs Act criminalizes a particular type of "robbery"—i.e., one that "obstructs, delays, or affects commerce," id. § 1951(a)—venue for a substantive Hobbs Act charge is "'proper in any district where interstate commerce is affected or where the alleged acts took place.'"  United States v. Smith, 198 F.3d 377,

14

383 (2d Cir. 1999) (emphasis added) (quoting United States v. Stephenson, 895 F.2d 867, 875 (2d Cir. 1990)); see also United States v. Bowens, 224 F.3d 302, 313 (4th Cir. 2000) ("[I]n a prosecution under the Hobbs Act, venue is proper in any district where commerce is affected because the terms of the statute itself forbid affecting commerce in particular ways."). This is consistent with Congress's ability to "provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." United States v. Johnson, 323 U.S. 273, 275 (1944); accord United States v. Bowens, 224 F.3d at 312–13 ("Congress may, consistent with the venue clauses of Article III and the Sixth Amendment, define the essential conduct elements of a criminal offense in terms of their effects, thus providing venue where those effects are felt.").[3]

Davis argues that basing venue on a potential effect on interstate commerce would effectively eliminate all constraints on venue in Hobbs Act cases. This is because even a potential effect on interstate commerce is sufficient to satisfy the jurisdictional element of the Hobbs Act, see United States v. Parkes, 497 F.3d 220, 230 (2d Cir. 2007), regardless

---

[3] Another crime for which the law recognizes venue both in a district where a defendant commits an act and in the district where the act has an effect is obstruction of justice. See 18 U.S.C. § 1512(i) (providing that prosecution for obstructing justice may be brought not only in "district in which the conduct constituting the alleged offense occurred," but also in "district in which the official proceeding . . . was intended to be affected"); United States v. Gonzalez, 922 F.2d 1044, 1054 (2d Cir. 1991) (stating that § 1512(i), then § 1512(h), codifies prior judicial decisions holding venue proper in "district where government proceedings were affected"); United States v. Reed, 773 F.2d at 486 ("The contacts with the Southern District for jurisdictional and enforcement purposes are no less because the attempt to obstruct the proceeding there failed.").

of the defendant's state of mind with respect to the commerce element, see United States v. Silverio, 335 F.3d 183, 187 (2d Cir. 2003). But we have had no occasion to consider whether the same conclusion applies to venue, particularly in light of our precedent discussing the need for some "sense" that the defendant chose venue, United States v. Reed, 773 F.2d at 481, even if only by foreseeing the effect of his actions in the venue district, see United States v. Rommy, 506 F.3d at 123. The point warrants little discussion on this appeal because the evidence shows both that an effect on interstate commerce in the Southern District of New York from the Elmont robbery was reasonably foreseeable to Davis, see infra at **[19–21]**, and that Davis purposefully took steps in the Southern District of New York to advance the robbery at a point where it seemingly had stalled, see infra at **[21–24]**.

Further, Davis stands convicted of attempted rather than completed Hobbs Act robbery. See 18 U.S.C. § 1951(a). Attempt is an inchoate offense, requiring that a defendant have taken a "'substantial step' in furtherance of the intended crime" to support conviction. United States v. Farhane, 634 F.3d 127, 146–47 (2d Cir. 2011) (collecting cases discussing how "substantial step" requirement widened ambit of attempt liability beyond that provided at common law), cert. denied, 132 S. Ct. 833. Where a particular attempt involves criminal activity spanning more than one district, venue can properly lie, consistent with caveats already discussed, "wherever the attempt . . . was begun,

16

continued, or completed." United States v. Drachenberg, 623 F.3d 122, 125 (2d Cir. 2010) (internal quotation marks omitted).

Most obviously, venue for attempt will lie in the district where a substantial step toward commission of the offense occurred. In the case of a Hobbs Act robbery, this means venue will lie in any district where a substantial step toward robbery took place. But because a Hobbs Act robbery must affect interstate commerce, venue may also be informed by where the defendant knew or reasonably should have foreseen that interstate commerce would be affected. As we have recognized in the context of conspiracy, another inchoate offense, venue may lie in a district where the defendant knows or reasonably should foresee that acts in furtherance of the criminal enterprise would take place, even if such events have not yet occurred. See United States v. Rommy, 506 F.3d at 123.

Thus, in reviewing Davis's challenge to venue in the Southern District of New York, we consider whether a reasonable jury could have found by a preponderance of the evidence that Davis (1) knew or reasonably should have foreseen that interstate commerce would have been affected in the Southern District by completion of the attempted Elmont robbery, or (2) took a substantial step in furtherance of that intended robbery in the Southern District. We identify record support for both these findings.

17

C.     The Location and Effects of the Attempted Elmont Robbery

In proceeding to "discern the location of the commission of the criminal acts" constituting the charged crime, United States v. Rodriguez-Moreno, 526 U.S. at 279, we readily identify any number of significant steps taken by Davis in the Eastern District of New York intended to culminate in the commission of Hobbs Act robbery.  On the morning of October 31, 2002, an armed Davis traveled to Elmont, Long Island, to commit the robbery.  There, he forcibly entered the target residence.  Once inside that residence, Davis shot and killed a woman in response to efforts to prevent him from carrying out the robbery.  These substantial steps brought the intended Hobbs Act robbery about as close to fruition as possible while still constituting an attempt.  Indeed, the only reason Davis's conduct qualified as an attempt rather than a completed crime was that his use of force resulted in the loss of human life rather than personal property.

These substantial steps in the Eastern District, however, are not the only circumstances relevant to venue.

1.     The Effect of the Attempted Elmont Robbery on Interstate Commerce in the Bronx

First, there is no question that the crime Davis came so close to committing would have affected interstate commerce directly in the Southern District of New York.  DeLeon was a large-scale drug dealer who acquired his contraband from out of state and sold it to customers in the Bronx and Manhattan.  Insofar as the planned Elmont robbery would

18

have stolen drugs intended for sale in these boroughs or money (the proceeds of such sales) that would have financed DeLeon's future drug sales in these boroughs, the robbery would have affected commerce in the Southern District of New York. See United States v. Needham, 604 F.3d 673, 682 (2d Cir. 2010) (explaining that commerce element may be satisfied by showing that "robbery depleted assets that would have purchased goods in interstate commerce," whether putative transactions are "legal or illegal").

To the extent there is any question as to whether Davis—in addition to Gunn and Needham—had actual knowledge of the Southern District locus of DeLeon's drug trafficking,[4] Davis's prior participation with Gunn and Needham in a pattern of robberies of persons dealing drugs in the Bronx, together with the proximity of DeLeon's home in Elmont to the Bronx, was enough to show that it was more probable than not that Davis understood the likelihood that this also would be a robbery of a drug dealer who sold drugs in the Bronx. See generally United States v. Rowe, 414 F.3d 271, 279 (2d Cir. 2005) (holding that defendant who posted advertisement for child pornography from home computer in Kentucky was properly prosecuted in Southern District of New York because he "must have known or contemplated" world-wide transmittal of advertisement); United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (holding that

---

[4] Davis did not raise this question in the district court, and the parties appear to have given it little attention at trial. In moving for a judgment of acquittal on Counts Two, Four and Five, Davis's counsel mistakenly called "[t]he fact that Mr. DeLeon may have run a drug business in the Southern District of New York" simply "irrelevant" to venue. Trial Tr. 1540.

"savvy investor" would reasonably foresee that his stock trades would be executed on either NYSE or AMEX in Southern District of New York); United States v. Kim, 246 F.3d 186, 193 (2d Cir. 2001) (holding that defendant who knew victim paid invoices from bank located in Southern District of New York could reasonably foresee faxes and wire transfers in that district). Thus, this case does not require us to delineate the constitutional limits of a venue determination based on a de minimis or collateral effect on interstate commerce unforeseeable to the defendant.[5] In this case, Davis attempted to affect illicit commerce that he reasonably could have foreseen was conducted in the Southern District of New York by committing a robbery in the Eastern District of New York, circumstances that support venue in both districts.

### 2. Davis's Substantial Steps in the Bronx in Furtherance of the Attempted Elmont Robbery

We need not here decide, however, whether this foreseeable potential effect on commerce in the Southern District of New York is sufficient, by itself, to support the challenged venue under our substantial contacts rule. See United States v. Reed, 773 F.2d at 481. Any concern in that respect is removed by a second circumstance relevant to venue: Davis's own actions on the morning of the attempted robbery directed at the Southern District of New York. On October 31, 2002, an armed Davis arrived at the DeLeon home ready to commit robbery. Such conduct, by itself, went beyond "mere

---

[5] We do not consider or decide whether Davis could have been prosecuted for crimes related to the Elmont robbery in California, the source location of DeLeon's drug supply.

20

preparation," United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980); it was a substantial step "planned to culminate" in the commission of the attempted Hobbs Act robbery, United States v. Ivic, 700 F.2d 51, 66 (2d Cir. 1983) (Friendly, J.) (citing Model Penal Code § 5.01(c) (Proposed Official Draft 1962), in explaining "substantial step" requirement of attempt),[6] abrogated on other grounds by National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 254–55 (1994); accord United States v. Farhane, 634 F.3d at 147. Having thus begun the attempt, Davis found his ability to proceed unexpectedly stalled by the failure of other members of the robbery crew to arrive on site as planned. To ascertain their whereabouts, Davis telephoned Needham at her Bronx residence. Upon learning from Needham that these crew members could not participate in the robbery that morning, Davis signaled his continued determination to proceed with the robbery by asking Needham to come to the site and act as his lookout. When she replied that she could not do so, Davis had her secure the assistance of another person.

In short, having taken one substantial step intended to culminate in the commission of the Elmont robbery, but having found the crime stalled by others, Davis used a telephone to reach into the Southern District of New York to commit a further substantial

---

[6] Ivic held that a defendant's agreeing to participate in a bombing authorized by a co-defendant, examining the target site, and having the explosives "readily available" were sufficient to constitute a substantial step toward the bombing's commission, although barely. 700 F.2d at 67. Here, not only had Davis agreed to participate in the robbery after the target site had been surveyed, but he had arrived at the site on the morning of the robbery, armed and ready to commit the crime.

21

step, procuring persons who could immediately provide the assistance necessary to restart the crime. See United States v. Rommy, 506 F.3d at 122 (discussing how defendant "propels" himself into district to which he makes telephone calls); see also United States v. Royer, 549 F.3d at 895 (holding that defendant's "electronic transmissions" into district supported venue where received). Indeed, because Davis made this telephone call as he stood outside the DeLeon home ready to enter and rob it, the identification of the call as a substantial step intended to culminate in the commission of Hobbs Act robbery is even more apparent than in United States v. Stephenson, where we held that telephone calls placed into the Southern District of New York laying the groundwork for bribes were "part and parcel" of a bribery offense culminating weeks later. 895 F.2d at 875. Although "not physically present" in the Bronx on October 31, 2002, Davis could not—and, as the evidence indicates, would not—have forged ahead with the robbery had he not "enter[ed], by telephone, the Southern District." Id. at 874.

Further, insofar as Needham, in the Bronx, then proceeded to make calls to secure the assistance Davis needed, her actions in the Southern District of New York in furtherance of the planned robbery are also fairly chargeable to Davis. See 18 U.S.C. § 2 (holding defendant responsible for actions of others that he "aids, abets, counsels, commands, induces or procures"); United States v. Lam Kwong-Wah, 924 F.2d 298, 302 (D.C. Cir. 1991) (recognizing that defendant who did nothing himself in venue district may nevertheless be held to account there if he aided and abetted confederates' acts in

22

district); see also Restatement (Second) of Agency § 212 (subjecting principal "to liability for the consequences of another's conduct which results from his directions" if principal "intends the conduct, or if he intends its consequences").

In sum, when we consider in the aggregate that (1) the elements and nature of the Hobbs Act required that Davis attempt a robbery that would have an effect on interstate commerce; (2) the effect on commerce of the attempted Elmont robbery would fall directly in the Southern District of New York; (3) the effect on commerce in the Southern District was at least reasonably foreseeable to Davis; (4) at a critical point after Davis had already taken a substantial step intended to culminate in Hobbs Act robbery, he took a further substantial step in the Southern District of New York that was essential to allowing him to proceed with that robbery; and (5) the Southern and Eastern Districts were equally suitable for accurate factfinding, we conclude that venue for the Hobbs Act and firearms crimes pertaining to the Elmont robbery was proper in the Southern District of New York. See United States v. Royer, 549 F.3d at 894–95.[7]

## III.    Conclusion

To summarize, we conclude that venue in the Southern District of New York for prosecution of the attempted Hobbs Act robbery in Elmont, Long Island, was supported by a preponderance of the evidence showing that (1) the robbery would have affected

_____

[7] In light of this conclusion, we need not reach the government's argument that venue in the Southern District is also supported by Needham's procurement in the Bronx, prior to Davis's joining in the plan for the robbery, of DeLeon's license plate number.

23

commerce directly in the Southern District of New York, where defendant Davis reasonably could have foreseen that the robbery target dealt the drugs and earned the drug proceeds that were the object of the robbery; and (2) after Davis had already taken a substantial step toward committing the attempted Elmont robbery only to have his plans stalled by the failure of confederates to appear on the scene, Davis used a telephone to reach into the Southern District of New York to procure the immediate assistance necessary to allow the crime to go forward.

For this reason and those stated in the related summary order filed today, the judgments of conviction entered against Davis and Gunn are AFFIRMED.

24