RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CARROLL LLOYD ELLIOTT (16-6474); LUCILLE M. FRIAL-CARRASCO (16-6676); PATRICIA ANN SOLOMON (16-6683),

*Defendants-Appellants*.

Nos. 16-6474/6676/6683

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:13-cr-00040-7—Amul R. Thapar, District Judge.

Decided and Filed:  November 30, 2017

Before:  KEITH, ROGERS, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

_____

**ON BRIEF:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER SOUTHERN DISTRICT OF OHIO, Cincinnati, Ohio, for Appellant in 16-6474.  Edward L. Metzger III, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellant in 16-6676.  Travis A. Rossman, ROSSMAN LAW, PLLC, Barbourville, Kentucky, for Appellant in 16-6683.  Charles P. Wisdom, Jr., Dmitriy Slavin, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky for Appellee.

_____

### OPINION

_____

ROGERS, Circuit Judge.  Defendants are all former employees of a South Florida pill mill.  Carroll Elliot was a security guard, Lucille Frial-Carrasco a physician and medical director,

and Patricia Solomon a physician assistant at the clinic in question.  They were all convicted in the district court below of conspiracy to distribute oxycodone and sentenced to terms in prison and forfeiture of proceeds.  Frial-Carrasco argues that venue was improper in the Eastern District of Kentucky because the customers who were known to be taking large amounts of pills back home to Kentucky were merely purchasers and not coconspirators, and thus no conspirator committed an overt act in Kentucky.  Venue in the Eastern District of Kentucky was proper, however, because the conspiracy's intended effects were in Eastern Kentucky, and a conspirator can be tried at the place where a conspiracy targets its acts. The defendants in this combined appeal raise several additional arguments to challenge their convictions, but these arguments lack merit.  However, the calculation of forfeiture amounts requires a remand in light of the Supreme Court's intervening decision in *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017).

## I.

From 2008 to 2014, the Pain Center of Broward ("PCB") in Ft. Lauderdale, Florida, was the place to go to find cheap pain pill prescriptions.  Indeed, the banner hanging in the waiting room advertised exactly that: "Pain Center of Broward, lowest cost prescriptions." At just $300 for an initial appointment, $200 for a repeat visit, and with discounts for loyal customers, a patient could leave the PCB with a monthly prescription for 180 30-milligram and 90 15-milligram pills of oxycodone.  By way of context, another doctor might prescribe a new patient two 5-milligram pills per day.  Business at the PCB boomed.  At its height, 60 to 65 patients a day arrived at the PCB.  They would overcrowd the waiting room and spill over into the parking lots, creating a mass so substantial that the clinic's staff feared that the crowds would attract the suspicion of federal agents.

The PCB was the brainchild of its owner, Joel Shumrak.  Shumrak was not a doctor, nor did he possess medical training.  As Shumrak testified at trial, the reason for the PCB's existence was straightforward: "[i]t was a good moneymaking arrangement."  Shumrak's assessment was accurate.  During its existence, the clinic generated over $10 million in profits.  To earn this sum required more business than the local market alone could provide.  Indeed, only about half of the PCB's customers came from Florida.  Instead, the clinic grew prosperous on a flow of out-of-

state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts.

Although the PCB saw patients from states around the nation, Kentucky was among its richest sources. Around 20 percent of the clinic's patients, some 1,800 people, were Kentucky residents. Seven of Eastern Kentucky's largest drug trafficking organizations used the PCB as their source for opioid pills. At the zenith of the PCB's business, one or more such trafficking groups a week, seven to ten people per crew, would travel to the clinic for a new set of prescriptions, to obtain pills to sell in Kentucky. Kentucky patients journeyed to the PCB in large part because government crackdowns had closed unscrupulous providers closer to home, and the PCB supplied prescriptions unavailable in Kentucky. The fact of the PCB's Kentucky clientele was not a secret at the clinic. Kentucky license plates filled the PCB parking lot. Some visitors would even sleep in their cars overnight, exhausted by the journey from Kentucky to Ft. Lauderdale. Kentucky patients continued to flock to the clinic, up until and including the day it closed.

Carroll Elliott began work as a security guard at the PCB in January of 2011. Shumrak hired Elliott because Shumrak feared that the large crowd of patients loitering around the outside of the PCB might arouse law enforcement's suspicions. Elliott spent his days keeping order in and around the clinic. He passed most of his time in the parking lot, guarding the front entrance and ensuring that no patients dawdled outside. Elliott also monitored the area around the clinic for those who might prove too attentive to the PCB, once ordering an undercover agent conducting surveillance off the property. When Elliott observed DEA agents or Ft. Lauderdale police watching the building, he would enter the clinic to warn patients of their presence. Elliott's duties were not confined to the periphery of the PCB. When rowdy patients clashed in the clinic's waiting rooms, Elliott would usher those troublemakers out. Elliott would also escort patients from the entrance of the PCB into waiting rooms. Sometimes, patients would offer Elliott money to reduce their waiting times. Elliott would accept the cash, and move those patients to the front of the line. When a doctor fell ill, Elliot would shuttle prescriptions from the clinic, to the doctor for signature, and then back again to the waiting patients.

Lucille Frial-Carrasco took a job at the PCB in 2012. She worked primarily as a doctor at the clinic, and also spent a term as its medical director. Frial-Carrasco's practice lay in the prescription of oxycodone. She wrote her average patient a prescription of 120 to 150 oxycodone tablets for a month's use. At trial, she testified that such amounts are most commonly appropriate for patients with traumatic injuries or in end-of-life care. Many of Frial-Carrasco's patients were Kentucky residents. She knew that they carpooled down to the PCB together, and considered that fact to be one of many "red flag[s]" that the PCB was a "pill mill." Throughout her tenure, Frial-Carrasco observed several other things she considered to be warning signs about the PCB's legitimacy, including the types of its patients, the distance they traveled to the clinic, the quantities of drugs prescribed, the clinic's cursory examinations, and its advertising techniques.

Frial-Carrasco also had a testy relationship with Shumrak. She testified that he would admonish her for the slowness of her appointments. (Frial-Carrasco aimed to spend 15 minutes per patient.) In January of 2014, Frial-Carrasco began to take greater initiative in reviewing patient files and recommending more tailored treatments. Shumrak objected to Frial-Carrasco's comparatively more measured pace. After several months of conflict between her and Shumrak, Frial-Carrasco resigned from the clinic a few days before its closure in June 2014.

Patricia Solomon joined the PCB as a physician assistant in 2010. As with Frial-Carrasco, Solomon's work involved generating drug prescriptions. With most patients, Solomon would examine them and fill out a form prescribing opioids. Solomon's examinations were brief, usually involving perfunctory questions about diet and exercise, and minimal physical contact. Because physician assistants in Florida cannot write prescriptions on their own authority, Solomon would bring the forms to a doctor for signature; those forms were almost always accepted. However, no doctor supervised Solomon while she gave the patients exams, or filled out their prescription amounts. Solomon would also assist doctors as they examined patients and fill out the prescriptions the doctors authorized. Occasionally, Solomon would suggest that a doctor was overprescribing and recommend a lower dose; the doctor would usually follow that advice. Many of the patients Solomon saw were Kentucky residents, and Solomon

knew that the patients traveled to the clinic for prescriptions.  Solomon continued working at the PCB until it closed.

On June 3, 2014, DEA agents raided the PCB.  They arrived with an arrest warrant for Shumrak and a search warrant for the clinic.  The agents entered with weapons drawn, but quickly holstered them after securing the building.  They arrested Shumrak, handcuffed him, and led him away.  The agents then escorted clinic employees to a business office in the front of the clinic, and began to search the rest of the building.  The lead DEA agent, Officer Dalrymple, told the employees, including Patricia Solomon, "that none of them were under arrest," but that "the agents" would like to talk to each one of them individually" after the agents completed the search.  This search took most of the morning.  During that time, clinic employees who needed to use the restroom, which was located in the area being searched, required an escort to prevent them from freely moving about that secured area.  The searchers did not otherwise prohibit the employees from leaving the business office, and the front door to the clinic lay open the whole time.

Around 1 p.m., a DEA agent and an investigator from the Florida Department of Health and Human Services brought Solomon to an examination room in the back of the clinic for an interview.  Solomon was familiar with this examination room, having frequently examined patients in it.  The room was narrow, about twenty-five to thirty-five feet in length, and the agents sat ten to fifteen feet away from Solomon.  The door to the room was closed but not locked.  The agents informed Solomon that she was not under arrest, and then proceeded to question her about her employment at the clinic.  During that conversation, Solomon made a series of incriminating statements, including that she knew many clinic patients came from Kentucky, that the patients had traveled to Florida expressly for medical treatment, and that the clinic saw few Florida residents.  Approximately 45 minutes into the interview, DEA Agent Dalrymple entered the room.  After about 5 minutes, the other agents concluded their questioning and Agent Dalrymple began speaking with Solomon.  Shortly thereafter, believing that Solomon was lying to him, Agent Dalrymple read *Miranda* warnings to Solomon.  Her prior questioners had not read Solomon these warnings.  Agent Dalrymple concluded the interview with Solomon after about fifteen to twenty minutes of his questioning.

Following the raid, a grand jury in the Eastern District of Kentucky indicted the defendants for conspiracy to dispense oxycodone.  Before trial, Solomon moved to suppress the statements made during her questioning, alleging that she was in custody and threatened by agents at the time she made them.[1]  After hearing testimony from Solomon and Agent Dalrymple, a magistrate judge filed a Report and Recommendation that the motion to suppress be denied.  The magistrate judge found that Solomon had not been in custody, based primarily on factors set forth in *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).  The magistrate judge based this evaluation on the relatively familiar location of Solomon's interview, the comparatively short questioning, and the lack of restraints on her movement.  The magistrate judge considered testimony from Solomon that agents had threatened her with penalties for non-cooperation, but specifically found this testimony "not credible."  The magistrate judge also rejected Solomon's argument for suppressing her post-*Miranda* statements pursuant to *Missouri v. Seibert*, 542 U.S. 600 (2004).  The district court adopted the magistrate judge's Report and Recommendation, holding that Agent Dalrymple's testimony that no coercion occurred was credible, and that Solomon's was not.

Also before trial the United States proposed to call Dr. Stanley Golovac, a practicing pain management physician, as an expert witness.  Dr. Golovac had reviewed 40 patient files provided to him by the prosecution, and proposed to testify as to how 28 of those files varied from the standard of care he would have used.  After evaluating Dr. Golovac's credentials and proposed testimony, the court permitted Dr. Golovac to testify as an opinion witness to the general standard of care and the care received by the patients in the files he reviewed, but not to whether any individual defendant violated that standard of care.  Dr. Golovac's trial testimony followed those lines.

After eight days of trial, a jury found the defendants all guilty of conspiracy.  Pursuant to that conviction, the court then assessed forfeiture of proceeds from the conspiracy, $10 million in total, against the defendants.  Applying the then-prevailing standards of *United States v. Honeycutt*, 816 F.3d 362, 379–80 (6th Cir. 2016), the court credited the defendants with $8 million previously forfeited by Joel Shumrak, and found them jointly and severally liable for

---

[1] Solomon now concedes that she was not threatened.  Solomon Brief at 42.

the remaining $2 million.  The court finally reduced the defendants' liability in proportion to the percentage of the conspiracy that they participated in: Frial-Carrasco, for example, involved in 80% of the conspiracy, was jointly and severally liable for 80% of $2 million, or $1.6 million.

Defendants now appeal.

## II.

Frial-Carrasco objects that the Eastern District of Kentucky was not a proper place to try her, but this argument fails because her participation in a conspiracy distributing oxycodone into Kentucky made the Eastern District of Kentucky a permissible venue for her trial.  The Constitution mandates that a criminal prosecution occur in the state and district where a crime is committed.  *See* U.S. Const. art. III § 2, cl. 3; *id.* amend. VI.  The Federal Rules of Criminal Procedure likewise compel the Government to "prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  Here, the fact that the conspirators distributed oxycodone to Kentucky residents for use in Kentucky meant that Kentucky was a place of commission for that PCB conspiracy, and the government could prosecute Frial-Carrasco there.

Uncontroverted evidence shows that the defendants knew they were distributing excessive quantities of opiates to Kentucky residents, and that the destination of the oxycodone would be Kentucky.  Indeed, the PCB's ability to effect such distribution in Kentucky was a key element in the clinic's success.  Kentucky residents were only willing to travel to Florida because Kentucky had sought to address that state's opioid problem by closing down unscrupulous providers closer to home.  The PCB gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents.  Realizing that gain, however, correspondingly allows trial in Kentucky based on the PCB's distributions.

Where, as here, a crime against the United States lacks a venue otherwise prescribed by statute, Congress has provided that the crime may be prosecuted "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  For a drug conspiracy like the one at issue in this case, the relevant offenses are "'continuous crimes'; that is, they are not completed until the drugs reach their final destination."  *United States v. Turner*, 936 F.2d 221, 226 (6th Cir. 1991).  In consequence, this court has held that venue is permissible at the intended

geographic end-point of a drug conspiracy. In *Turner*, for example, we held that Michigan was a permissible venue to try a drug importation offense for defendants who operated an air-strip in the Bahamas, which drug smugglers used to fly cocaine from Colombia into Michigan. *Id.* at 223. In that case, because the drug importation offense continued through the cocaine's arrival in Michigan, the Turners could be tried in Michigan. *Id.* at 226. Here, likewise, Kentucky was the final destination of the oxycodone that Frial-Carrasco and her co-conspirators supplied, and so it was permissible to try their conspiracy in Kentucky.

Finding venue in Kentucky because it was the intended destination of the pills prescribed at the PCB is fully consistent with general principles of venue law. As this and a number of other circuits have long recognized, "[s]o long as an overt act . . . is intended to have an effect in the district where the case is finally brought, venue is proper [there]." *United States v. Frederick*, 835 F.2d 1211, 1215 (7th Cir. 1987); *see also United States v. Williams*, 788 F.2d 1213, 1216 (6th Cir. 1986) (finding that where a defendant jumps bail, the "effect in the district where a defendant is ordered to appear" supports venue there). Indeed, as the Second Circuit has affirmed, "places that suffer the effects of a crime are entitled to consideration for venue purposes. Such districts have an obvious contact with the litigation in their interest in preventing such effects from occurring." *United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985).

Other circuits have thus similarly held that the location of a crime's effects is a permissible place of prosecution for various crimes. For example, multiple circuits, including this one, hold that venue for obstruction of justice "is proper in the district in which the proceeding sought to be obstructed is pending even though the would-be obstructive acts took place elsewhere." *Id.* at 486. *See also United States v. Cofield*, 11 F.3d 413, 419 (4th Cir. 1993); *Frederick*, 835 F.2d at 1215; *United States v. Tedesco*, 635 F.2d 902, 906 (1st Cir. 1980); *United States v. O'Donnell*, 510 F.2d 1190, 1193 (6th Cir. 1975). Likewise, other circuits have affirmed that venue is proper in the place of an act's intended effect for crimes as diverse as non-payment of child support, *see, e.g.*, *United States v. Muench*, 153 F.3d 1298, 1301 (11th Cir. 1998); *United States v. Murphy*, 117 F.3d 137, 140 (4th Cir. 1997); *United States v. Crawford*, 115 F.3d 1397, 1405 (8th Cir. 1997); and Hobbs Act robbery, *see United States v. Davis*, 689 F.3d 179,

187 (2d Cir. 2012) ("[V]enue may also be informed by where the defendant knew or reasonably should have foreseen that interstate commerce would be affected.").

This result is also not unjust to a defendant like Frial-Carrasco. As the Second Circuit has explained in another criminal conspiracy case, "defendants, having concocted a scheme that relied so heavily on the actions of [district residents] for its success . . . can hardly complain that their very *modus operandi* subjected them to prosecution in numerous districts, including the Eastern District of New York." *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008). The same principle operates here. By conspiring to distribute oxycodone to Kentucky residents for use in Kentucky, Frial-Carrasco permitted her prosecution in Kentucky.

Frial-Carrasco urges this court to distinguish her case from *Turner*, objecting that, because the record did not clearly show that the PCB conspirators conspired with Kentucky drug gangs to redistribute the oxycodone in Kentucky, no act of the PCB conspiracy occurred in Kentucky. But this argument ignores the ways in which Kentucky's status as the intended final destination of the oxycodone supplied by the PCB conspiracy allowed a prosecution of that conspiracy there. There was evidence that the co-conspirators knew that they were distributing prescriptions to Kentucky residents, and that the destination of the prescribed opioids would be Kentucky. It thus does not matter for these venue purposes whether the defendants were aware that they were supplying Kentucky drug distribution rings for subsequent redistribution in Kentucky, or merely thought that the clinic's patients were the end-users themselves. In either case, the prescriptions issued by the clinic resulted in the distribution of oxycodone to Kentucky, and *Turner* holds that such intended final destinations of drug conspiracies are places of proper venue. *See Turner*, 936 F.2d at 226.

Frial-Carrasco's argument is also unresponsive to the fact that conspiracy does not always require the presence of a co-conspirator in the venue. For example, hypothetical defendants who conspired in Florida to mail a bomb to a Kentucky address would presumably be subject to prosecution in Kentucky, even if the mail carrier who delivered the package was clearly not a coconspirator. Here, Frial-Carrasco and her coconspirators conspired to deliver oxycodone into Kentucky, and so they face prosecution in Kentucky, regardless of whether the

patients to whom they distributed those drugs were in the conspiracy with them, or were just the conduits for carrying the drugs back to Kentucky.

Frial-Carrasco also identifies a case from the Seventh Circuit, *United States v. Johnson*, 592 F.3d 749 (7th Cir. 2010), which emphasized that a drug seller should not be automatically assumed to have entered into a conspiracy with a drug purchaser by virtue of that sale. But *Johnson* is simply not a venue case. Kentucky would be a place of proper venue regardless of whether Frial-Carrasco and the PCB conspiracy conspired with Kentucky patients to redistribute the oxycodone in Kentucky. In short, the district court properly found venue for this prosecution existed in the Eastern District of Kentucky.

## III.

Elliott challenges the sufficiency of the evidence against him, but his conviction was proper because the government presented sufficient evidence for a reasonable jury to conclude that Elliott knowingly joined the conspiracy to distribute oxycodone. A criminal conviction will be upheld if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009) (citations omitted). Elliott's challenge fails because the record shows ample evidence on which this jury could have come to that conclusion.

For conviction on conspiracy to distribute drugs, "the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)). Here, the evidence of Elliott's conduct introduced at trial was sufficient to permit a jury to find that Elliott met all elements of this offense. Elliott was hired to protect the PCB, and worked with diligence to impede those who would scrutinize it. His diligence in clearing the parking lot of lines of patients prevented investigators from realizing the nature of the clinic's practice. His efforts in chasing away those who would watch the property impeded the investigations once they began. For those investigators whom Elliott could not drive off, he warned patients of their presence.

When patients would otherwise have been deprived of their prescriptions, Elliott shuttled bags of prescriptions back and forth to a doctor for signature. Although his role was not a principal one, Elliott proved instrumental to the success of the conspiracy at the PCB.

Elliott concedes that his actions might allow a jury to conclude that he may have been aware of the conspiracy, but not that he knowingly and willingly joined it. Yet Elliott's behavior permitted the jury to draw such an inference. As we have held, "[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)). *Avery* demonstrates how, as in this case, a defendant's actions may be probative of knowing participation in a conspiracy. In *Avery*, we held that a jury could infer that a defendant knowingly participated in a conspiracy to produce marijuana because she lived on a farm where marijuana was being grown, knew that the marijuana was present there, and had helped move grow lights. *Id.* Here, similarly, a jury could consider Elliott's apparent exposure to the nature of the clinic's activities, and reasonably deduce Elliott's knowledge of and participation in the conspiracy from his actions in response, including Elliott's choice to remain employed at the PCB, his work in facilitating its prescriptions, and his warnings about government surveillance.

Elliott suggests that *United States v. Coppin*, 1 F. App'x 283 (6th Cir. 2001), demonstrates how proximity to a conspiracy does not necessarily impute knowledge of and participation in a conspiracy, but the facts of *Coppin* are not analogous to those here. In *Coppin*, we held that there was insufficient evidence of conspiracy to possess and distribute cocaine where a defendant was acquainted with a drug dealer, and was present but unaware when a third party purchased drugs from that drug dealer. *Id.* at 291–92. Here, by contrast, Elliott was not merely in the vicinity while other employees of the PCB carried on a conspiracy behind his back; Elliott instead possessed sufficient information to realize that the conspiracy was occurring, and took actions that furthered the conspiracy's goals. A jury thus could conclude that Elliott knew of and participated in the conspiracy

**IV.**

Both Frial-Carrasco and Solomon challenge their convictions on similar theories—that the government was required, but failed, to present expert testimony that their actions were not permissible as professional practice. While both defendants identify cases in which courts have held that expert testimony is sometimes required to assess the guilt of a medical professional distributing drugs, this expert testimony is not required where, as here, such distributions plainly exceed medical use. In circumstances like these, a jury is entitled to use its lay understanding of what drug distributions are clearly illegitimate, and therefore did not require additional expert guidance to convict either Frial-Carrasco or Solomon.

**A.**

Frial-Carrasco challenges her conviction on the grounds that the government failed to present sufficient evidence that the prescriptions she wrote were outside the scope of her professional duties, but this argument fails because the evidence was of such a nature that a lay jury could conclude that Frial-Carrasco's prescriptions were plainly excessive.

Here, the evidence required no expert interpretation to prove that Frial-Carrasco's actions were not within the realm of legitimate medicine. The government showed that Frial-Carrasco prescribed opioids in doses generally not found outside patients with traumatic injuries or in end-of-life care, that she thought the PCB possessed the "red flags" of a pill mill, and that she continued working there regardless. The jury also heard about the extremely short time Frial-Carrasco spent with patients and her knowledge of the distances they traveled to obtain prescriptions at the clinic. Dr. Golovac's expert testimony offered additional evidence to distinguish Frial-Carrasco's actions from those of an ordinary doctor, and thus prove her participation in the conspiracy. Frial-Carrasco objects that Dr. Golovac did not specifically opine that she had prescribed outside the scope of her medical practice, but he was not required to do so. On this evidence, the jury did not require specific expert assistance to guide its decision-making as to Frial-Carrasco's culpability.

Frial-Carrasco objects that the jury was not capable of assessing whether she had committed a crime, but this argument is mistaken because no expert testimony is required where

actions are comprehensible through even lay knowledge.  It is true that a physician may only be convicted for violation of the Controlled Substances Act if she "prescribed the drug without a legitimate medical purpose and outside the course of professional practice."  *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995) (quoting *United States v. Varma*, 691 F.2d 460, 462 (10th Cir. 1982)).  Although understanding what a legitimate medical purpose is (and thus whether a prescription violated the Controlled Substances Act) often understandably requires expert guidance, we have also affirmed that "there are cases in which the lay testimony is so clear that no expert testimony is required to determine that the defendant's actions were not for a legitimate medical purpose nor in the usual course of professional practice."  *United States v. Word*, 806 F.2d 658, 663 (6th Cir. 1986).  In *Word*, for example, we held that a physician who wrote great quantities of prescriptions, for large sums of money, and with no examination could be properly convicted without expert testimony.  *Id.* at 663–64.

Frial-Carrasco accepts *Word* as controlling but objects to what she views as an anomaly: on her interpretation, expert testimony is required in a malpractice suit where only money damages are at stake, but not in a criminal case where liberty is at stake.  It is not clear, however, that evidentiary rules providing some protection to defendants in private money damages suits, under a lenient preponderance-of-the-evidence standard, are at all relevant to public prosecutions, where facts must be found beyond a reasonable doubt.  In any event, *Word*'s principles exist in the civil malpractice context as well.  Under Kentucky law, for example, in a medical malpractice case, "no expert testimony is needed in situations 'where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.'"  *Vance By & Through Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (quoting *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965)).  Because the common knowledge and experience of this jury here was likewise sufficient to assess Frial-Carrasco's guilt, *Word*'s rule properly applies to her case.

**B.**

Solomon similarly contends that expert testimony was required to assess any deficiencies in her practices as a physician assistant, but her challenge fails for the same reasons as does Frial-Carrasco's.  A lay jury using its common understanding could conclude from Solomon's

practices at the PCB that she knowingly participated in its conspiracy to distribute oxycodone. *See Word*, 806 F.2d at 663. Solomon saw patients and filled out prescriptions recommending unusually large doses of opioids. Solomon was not supervised in her tasks by a doctor, and doctors generally treated their signature on prescriptions filled out by Solomon as a formality. As with Frial-Carrasco, Solomon saw a full range of violations at the PCB, and contributed to many of them. A jury did not require expert instruction on the scope of a physician assistant's duties to determine that Solomon's behavior fell outside of them.

Solomon urges the court to follow *United States v. Binder*, 26 F. Supp. 3d. 656, 658 (E.D. Mich. 2014), and hold that there was insufficient evidence to prove distribution of narcotics outside the scope of Solomon's professional practice. *Binder* is, however, a poor guide to the issues in this case. In *Binder*, a doctor was charged with unlawful distribution of controlled substances, but extensive evidence supported a good-faith defense, including the thoroughness of the doctor's examinations, the regularity of his practice, and the reality of his patients' injuries. *Id.* at 663–64. Here, by contrast, Solomon's examinations were cursory, the practices of the PCB highly irregular, and the doses prescribed at the clinic clearly in excess of any medical need. As *Binder* confirms, expert testimony is not necessary where there is "evidence of plainly improper prescribing practices that a lay juror could recognize as illegitimate." *Id.* at 662. On this evidence as well, a jury was entitled to draw similar conclusions.

## V.

Solomon additionally challenges the introduction of incriminating statements she made to investigators without having been read her *Miranda* rights, but because no *Miranda* warnings were required when Solomon incriminated herself, the district court committed no error in refusing to suppress these statements. Under *Miranda*, the Fifth Amendment requires that a person in custodial interrogation must be informed of and choose to waive her rights in order to have the statements used against her. *Miranda v. Arizona*, 384 U.S. 436, 467–69 (1966). But no *Miranda* warnings are necessary if a subject is not in custody and is free to leave. *See United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998). Here, because both the magistrate judge and the district court correctly held that Solomon was not in custody at the time she incriminated

herself, she was not entitled to a *Miranda* warning and so there was no error in refusing to suppress her statements.

In this case, the setting and non-coerciveness of Solomon's interview mean that the magistrate judge and district court both correctly held that she was not in custody. The determination of whether a person is in custody is based on the totality of the circumstances. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). This court has highlighted four factors as particularly relevant: "the location of the interview, the length and manner of the questioning, whether the individual possessed unrestrained freedom of movement during the interview, and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). In proceedings below, the magistrate judge and the district court correctly determined that the first, second, and third *Panak* factors all favored the government, and that the fourth was of marginal weight. Those conclusions rested on findings of fact, which are reviewed only for clear error, *see United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), and Solomon fails to meet the burden necessary to overcome any of those determinations.

With regard to the first factor, the location of the interview did not support a finding of custody. The magistrate judge noted that "Solomon was interviewed at her place of business, in an exam room that she was familiar with, with law enforcement remaining ten to fifteen feet from her throughout the interview." The district court similarly credited this factor as operating in the government's favor. Solomon contends that the fact that the door was closed and that the government agents allegedly requested she turn in her license changed the room "from a familiar and comfortable place into a crime scene." This argument is not convincing. The simple fact of being questioned at work, even by government investigators, does not suffice to make an interrogation custodial, especially when the venue is a familiar one. In *United States v. Crossley*, for example, we held that a defendant interviewed in an unused classroom at a base where she worked was "not questioned in a hostile or coercive environment" because she was familiar with that space. 224 F.3d 847, 861–82 (6th Cir. 2000).

Similarly, the length and manner of the questioning also favor a finding that Solomon was not in custody. Solomon concedes that "she was not threatened" by agents, and that the

questioning was short. Solomon nevertheless contends that the combination of the fact of the raid and the alleged request that she surrender her license "transformed the situation into one in which a reasonable person would not feel free to leave." *Id.* Both the magistrate judge and district court analyzed this situation, however, and determined that the interview was not hostile, because, as the magistrate judge reasoned, "no reasonable person would have, based on these facts, believed that she was in custody." Solomon's internal perceptions, even if accurate, do not overcome what is an objective-person test. *See Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). Neither does Solomon's assertion that investigators allegedly demanded that she surrender her license change the analysis. While neither the magistrate judge nor the district court made a specific finding of fact about if or when this demand occurred, Solomon did testify in the suppression hearing that she had been asked to surrender her license, and both the magistrate judge and the district court generally found that her testimony was not credible. Solomon's third repetition of this claim does not result in a different conclusion here.

Solomon places her greatest reliance on the third *Panak* factor, alleging that the nature of the raid into the PCB meant that she did not enjoy unrestrained freedom of movement, and thus was in custody because she was not free to leave. Solomon's argument again flies in the face of the fact-finding below. The district court expressly found that "agents did not limit [Solomon's] freedom to leave." This fact-finding was not clearly erroneous. Solomon contends that the fact she required permission and an escort to use the restroom constituted restraint on her movement. The record, however, shows that such restrictions existed only for the purposes of facilitating the search of the clinic, and did not otherwise restrict Solomon's movement. The mere existence of a restricted area in a location does not transform questioning in that location into a custodial situation if the defendant is otherwise free to leave. For example, an individual questioned in a police station is not in custody if free to leave that station, *see Biros v. Bagley*, 422 F.3d 379, 389–90 (6th Cir. 2005), even though a police station includes analogously restricted areas. Under Solomon's theory, suspects questioned in such a station would always be found to be in custody. They are not, and she was not.

With the first three *Panak* factors weighing so strongly in the government's favor, the fourth factor, whether Solomon knew that she need not answer questions, is not decisive to the

analysis, because *Panak* is a totality of the circumstances test. *See United States v. Conder*, 529 F. App'x 618, 621 (6th Cir. 2013). The district court found that this factor weighed in Solomon's favor, because there was no evidence that she was told that she need not answer questions. Because this factor is so heavily outweighed, however, even finding that it favors Solomon is not sufficient to overcome the weight of the other three factors against her.

Similarly, Solomon notes that she has the benefit of the fact that she did not initiate contact with police. It is true that we have sometimes listed this element as relevant to a totality-of-the-circumstances determination. *See Swanson*, 341 F.3d at 529. The totality of these circumstances continues to favor the government, however, whether or not this additional factor is included. Because Solomon thus has failed to show that the decisions of the magistrate judge and district court were in error, either in fact or in law, she was not entitled to have her statements suppressed.

**VI.**

Although defendants' convictions stand, the forfeiture judgments must be remanded to the district court for the limited purpose of recalculation, to an amount proportionate with the property defendants actually acquired through the conspiracy.

The United States concedes that, following the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017), the forfeiture judgments no longer rest on appropriate legal foundations. In *Honeycutt*, the Supreme Court overturned the standards on which the district court had relied, and found that "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Honeycutt*, 137 S. Ct. at 1635. The Court thus held that 21 U.S.C. § 853(a)(1) forfeiture is not subject to joint and several liability. *Id.* The United States now concedes the need to remand for forfeiture of proceeds up to the amount each defendant acquired from the crime, and without the imposition of joint and several liability. Gov. Brief at 51–52.

This remand applies to all three parties. Both Frial-Carrasco and Solomon properly raised this issue in their briefs. Elliott did not, but the United States agreed to a remand that

extends to Elliott as well, and we retain the power to correct plain error, *see United States v. Graham*, 275 F.3d 490, 521–22 (6th Cir. 2001).

## VII.

The judgment of the district court is affirmed with respect to the convictions, but the forfeiture judgments are remanded for recalculation consistent with the standards delineated by the Supreme Court in *Honeycutt*.